D. John Ashby, ISB No. 7228
William K. Smith, ISB No. 9769
**HAWLEY TROXELL ENNIS & HAWLEY LLP**
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone:  208.344.6000
Facsimile:  208.954.5200
Email: jashby@hawleytroxell.com
        wsmith@hawleytroxell.com

LINDSEY D. G. GATES *[Pro Hac Vice Pending]*
**BARNES & THORNBURG LLP**
1 N. WACKER DR., STE. 4400
CHICAGO, IL  60606
Telephone:  312.214.4855
Facsimile:  312.759.5646
Email:  ldates@btlaw.com

Jason T. Clagg *[Pro Hac Vice Pending]*
A. Elizabeth Underwood *[Pro Hac Vice Pending]*
**BARNES & THORNBURG LLP**
888 S. Harrison Street, Suite 600
Fort Wayne, IN 46802
Telephone: 260.425.4646
Facsimile: 260.424.8316
Email: jason.clagg@btlaw.com
        elizabeth.underwood@btlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KIBBLE & PRENTICE HOLDING COMPANY, d/b/a USI INSURANCE SERVICES NORTHWEST,<br><br>                     Plaintiff,<br><br>vs.<br><br>LEE TILLEMAN,<br><br>                     Defendant. | Case No. 3:21-cv-00083-BLW<br><br>DECLARATION OF GARY PATTERSON |

## DECLARATION OF GARY PATTERSON

I, Gary Patterson, declare as follows:

1.      I am a Practice Leader for USI Insurance Services Northwest ("USINW").

2.      I have personal knowledge of the facts stated herein and, if called upon to testify in this case, I would and could competently testify to the facts contained herein based upon my own personal knowledge.

3.      USINW is a wholly-owned subsidiary of USI Insurance Services ("USI Insurance") and serves clients in the northwest region of the United States.  USI Insurance, together with USINW and its other divisions and subsidiaries, is one of the largest insurance brokerages in the United States and provides a full range of insurance, risk management, and other related services.  (In this Declaration, I will refer to USINW and USI Insurance collectively as "USI.")

4.      USI employs a team of insurance brokers called "Producers" to identify, solicit, and service existing and prospective client relationships for the benefit of USI.

5.      USI regularly conducts repeat business with its clients.  When policies are set to expire, for example, USI works with its clients to evaluate renewal options.

6.      USI also works with its clients to identify cross-selling opportunities and place other types of insurance.

7.      The relationships and goodwill that USI cultivates with its clients are integral to USI's business.  Such relationships and goodwill are developed by hiring and training skilled personnel – especially Producers.  Through such Producers, USI has developed a solid reputation in the community and worked to identify and satisfy client needs.

DECLARATION OF GARY PATTERSON - 2

8.      USI relies on its Producers to develop client relationships for the benefit of USI by encouraging repeat business, cross-selling other USI products, and obtaining referrals.

9.      On May 4, 2018 (the "Effective Date"), USI Insurance purchased the membership interests, customer accounts, and associated goodwill of CHS Insurance Services, LLC ("CIS"), a Minnesota limited liability company and a leading agribusiness insurance brokerage.  Like USI, CIS was an insurance brokerage that employed and relied on Producers to solicit clients for CIS and develop and maintain relationships and goodwill with CIS's clients for the benefit of CIS.

10.     In conjunction with the closing of the Purchase, and to maintain and continue the business goodwill and customer accounts it had acquired from CIS, USI Insurance offered Lee Tilleman ("Tilleman") a position as a Producer at USI Insurance to become effective upon the closing of the Purchase.  In that position, Tilleman would work with the same client accounts as he had for CIS so he could continue to develop and maintain goodwill with those accounts for USI.

11.     Tilleman's terms and conditions, which he had an opportunity to negotiate, were set forth in a new Employment Agreement that USI Insurance sent to him on April 19, 2018, and which became effective on May 4, 2018.   (A true and correct copy of the Employment Agreement is attached as Exhibit A-1.)

12.     On or about January 1 2021, USI Insurance assigned Tilleman's Employment Agreement to USINW, which Tilleman consented to in the Employment Agreement.

13.     As consideration for entering into the Employment Agreement, USI provided Tilleman separate and additional compensation to which he was not otherwise entitled in the

DECLARATION OF GARY PATTERSON - 3

form of a Retention Payment and an Acquisition Bonus.  **On information and belief,** Tilleman received over two hundred thousand dollars ($200,000) in his Acquisition Bonus alone.

14.     Tilleman has received substantial compensation as a result of his employment with USI – hundreds of thousands of dollars – to date.

15.     In the Agreement, Tilleman acknowledged that, in his role as a Producer, he had, and would continue to have, significant responsibility for maintaining and enhancing the goodwill of USI Insurance with respect to its client accounts and relationships with prospective clients.

16.     Tilleman further acknowledged that USI had a "reasonable, necessary and legitimate business interest" in protecting USI's "Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business" and that the terms and conditions of the Agreement were reasonable and necessary in order to protect those interests.

17.     To protect USI's goodwill and other business interests, and in consideration for the Retention Payment and Acquisition Bonus and other good and valuable consideration, Tilleman agreed to the following covenants in his Employment Agreement:

> **2.3 *No Conflicts of Interest***. During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company, unless disclosed to and agreed to by the Regional CEO and Chief Compliance Officer in writing. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.
>
> * * * *
>
> **2.4 *Duty of Loyalty***. Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely

perform all duties and responsibilities hereunder in furtherance of the business of the Company and any other USI Company.

* * * *

**2.5 *Term***. Producer's employment hereunder shall commence on the Effective Date and continue until terminated pursuant to Section 9 (the "**Term**").

* * * *

**8.2 *Confidentiality During and Following Term***. During the Term and for five (5) years after Producer[1] is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure). …

* * * *

**8.5 *Non-Solicitation of Clients and Active Prospective Clients***. In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's[2] prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the

---

[1] In the Agreement, "Producer" refers to Tilleman.
[2] In the Agreement, "Company" refers to USINW Insurance.

DECLARATION OF GARY PATTERSON - 5

Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

* * * *

**8.6 *Non-Acceptance / Non-Service of Clients and Active Prospective Clients*.** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

* * * *

**9.2 *Termination by Producer*.** Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company. The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may: (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

59014.0001.13556596.1

18.     The above covenants are designed to protect the goodwill that USI has established and developed through its Producers (and the confidential information that USI provides to its Producers).

19.     The Employment Agreement's non-solicitation and non-service restrictions are limited to the Client Accounts and the Active Prospective clients that a departing Producer either personally solicited, serviced, or managed (or about which the Producer obtained confidential information on behalf of USI).

20.     The two-year time limit on the restriction against soliciting or serving USI's clients is needed to give USI the time necessary to assign and train a new Producer to take over a client account, familiarize a new Producer with a client's particular needs, and maintain a relationship with the client.

21.     Notably, many of the insurance products that USI places for its clients have a one-year policy period.  USI's efforts to guide and assist a client through the critical renewal stage  –  which are performed largely through its Producers  –  typically begin months before a renewal date.

22.     If a Producer leaves USI just days, weeks, or a few months before a client's renewal date, USI's ability to assist a client through the renewal process will necessarily be rushed, and could be used against USI by competitors or the departing Producer.  The two-year limit ensures that USI, and the new USI Producer assigned to a Client Account, will have an opportunity to show her worth and value to the client by working with and servicing the client for a full policy-period (and guiding and assisting the client through the next renewal process under more typical circumstances).

DECLARATION OF GARY PATTERSON - 7

23.     The shorter six-month restriction on soliciting or servicing USI's Active Prospective Clients is designed to preclude a departing Producer from capitalizing on USI's goodwill and relationships with respect to such active leads (about which the Producer may have confidential information by virtue of her USI employment).

24.     Tilleman agreed that the time and scope of the covenants in the Employment Agreement were reasonable and necessary to protect USI's confidential information, goodwill, and other business interests.  Tilleman further agreed that, if a court were to find that any covenants in the Agreement exceeded the permissible scope or limit, "such covenants shall be reformed to the maximum permissible time or scope limitations" and that "[i]f a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ('blue penciled') or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced."

25.     In the Agreement, Tilleman also acknowledged that the services he would render as an employee of USI were "of a special unique, and extraordinary character," that "it would be extremely difficult or impracticable to replace such service," and that "any damage caused by [Tilleman's] breach of Section 8 of the Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation."

26.     Tilleman also agreed that, if he violated Section 8 of the Agreement, USI would be entitled to injunctive or other equitable relief, in addition to any other available rights or remedies.

27.     Tilleman was the face of USI for the clients he serviced and the prospects he solicited during his USI employment.

DECLARATION OF GARY PATTERSON - 8

28.     USI encouraged, facilitated, and invested in Tilleman's efforts to develop relationships with USI's Client Accounts and client leads by, among other things, providing Tilleman with:  (i) information about prospective client leads; (ii) training, education, and business development opportunities; (iii) financial support; (iv) access to the insurers, underwriters, and brokers with whom USI has agency relationships; (v) value added support services such as client claim services, loss control service, and risk management services; and (vi) infrastructure and support personnel to help Tilleman's efforts to establish and expand USI's relationship with its clients.

29.     On February 3, 2021, via an e-mail message to me, Tilleman abruptly and unilaterally declared that he was resigning from USINW "effective immediately."  Tilleman directed all future communications to his attorney.  (A true and correct copy of Tilleman's February 3, 2021 resignation e-mail is attached as Exhibit A-2.)

30.     On February 3, 2021, another USI Producer, Vanessa Anderson, also announced that she was resigning from USI "effective immediately."  Anderson and Tilleman jointly serviced many of the same client accounts for USI.  Anderson entered into an employment agreement with USI that is substantially similar to Tilleman's Agreement.

31.     Almost immediately after providing notice that they were resigning from USI and without waiting the 60-days required, Tilleman and Anderson accepted employment as Producers with Alliant.  By no later than February 8, 2021, Tilleman was publicizing his employment with Alliant on his LinkedIn profile page.  (A true and correct copy of Tilleman's LinkedIn page is attached as Exhibit A-3.)

32.     The purpose of the 60-day notice in Tilleman's Agreement is to provide USI the necessary time to facilitate the orderly transition of client account relationships.

DECLARATION OF GARY PATTERSON - 9

33.     By breaching the 60-day notice provision in violation of Sections 2.3 and 2.4 of his Agreement, and then compounding that breach by immediately joining a direct USI competitor (and publicizing that he had done so), Tilleman has severely hampered USI's ability to maintain and continue its relationships and goodwill with the client accounts Tilleman serviced for USI.

34.     Following his attempted resignation, Tilleman has not returned to work for USI. Pursuant to Section 9.2 of the Agreement, USI maintains that Tilleman's purported resignation from USI violates the 60-day notice requirement and Tilleman's purported acceptance of employment with Alliant violates his obligations under Sections 2.3, 2.4, and 9.2 of the Employment Agreement.

35.     I am aware that on February 4, 2021, in an effort to minimize harm caused by Tilleman's breach, USI sent a letter to Tilleman indicating that his effective resignation date was April 3, 2021, and reminding him of his obligations under the Agreement.  (A true and correct copy of the February 4, 2021 letter from USI to Tilleman is attached as Exhibit A-4.)

36.     Pursuant to Section 9.3 of the Employment Agreement, USI has committed to paying Tilleman any commissions earned through the remainder of the 60-day notice period (*i.e.*, April 3, 2021).

37.     On or about February 9, 2021, USI received a call from one of USI's large agribusiness co-op clients that had been serviced for USI by Tilleman.  The client advised USI that it would be transferring its business from USI to Alliant.  USI's annual commission revenue from this client alone was approximately one hundred thousand dollars ($100,000.00).

38.     On or about February 10, 2021, USI was informed by another one of its large agribusiness co-op clients  –  serviced by Tilleman and Anderson  –  that it too would be

DECLARATION OF GARY PATTERSON - 10

transferring its business from USI to Alliant.  USI's annual commission revenue from this client alone was over one hundred thirty thousand dollars ($130,000.00).

39.     On or about February 15, 2021, USI was informed that yet another one of its large agribusiness clients  –  again serviced by Tilleman and Anderson  –  would also be transferring its business from USI to Alliant.

40.     Tilleman's breaches of his contractual promises are causing imminent and irreparable injury to USI's goodwill and client relationships.

41.     As a result of Tilleman's actions, USI has already lost 10 clients serviced by Tilleman and has received Broker of Record ("BOR") letters from 8 of those clients (which indicate that such clients intend to leave USI for another broker, almost certainly, Alliant).

42.     Based on discussions with its clients and others, USI expects to receive additional BORs concerning other Tilleman-serviced clients in the days to come.

43.     Under the terms that insurance companies follow when a client changes its broker, USI has only days to try to convince those clients to rescind the change and stay with USI.

44.     USI stands little chance of succeeding in those efforts if Tilleman is allowed to continue to violate his Agreement.  Once those clients leave, USI will not only lose the future commissions to be generated by those accounts, USI will also lose all of the goodwill and opportunities for expanding and continuing relationships that USI established with such clients through its employment of Tilleman.  (True and correct copies of BORs that USI has received for clients serviced by Tilleman are attached as Exhibit A-5.)

59014.0001.13556596.1

45.     Unless Tilleman's conduct is immediately stopped, USI will continue to suffer additional irreparable harm to its client relationships and goodwill that monetary damages alone cannot repair.

46.     Pursuant to 28 U.S.C. § 1746, I, Gary Patterson, declare under penalty of perjury that the foregoing is true and correct and was executed within the United States on February 19, 2021.

Dated:  February 19, 2021

*Gary Patterson*

_____
Gary Patterson

# EXHIBIT

# A – 1

*Execution Copy*

## EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT ("**Agreement**"), effective as of the Effective Date (as defined below), is by and between USI Insurance Services LLC, a Delaware limited liability company (the "**Company**"), and Lee Tilleman ("**Producer**").  The Company and Producer are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, pursuant to that certain Membership Interest Purchase Agreement (the "**Purchase Agreement**") by and between the Company and CHS Inc., a Minnesota corporation ("**Seller**"), the Company will purchase from Seller all of the issued and outstanding membership interests of CHS Insurance Services, LLC, a Minnesota limited liability company ("**CIS**"); and

WHEREAS, contingent upon the closing of the transactions contemplated by the Purchase Agreement (the "**Closing**"), and provided this Agreement is accepted in full by Producer, the Company desires to employ Producer on the terms and conditions herein and Producer is willing to accept employment on such terms and conditions; and

WHEREAS, Producer's covenants herein are a material inducement for the Company to enter into this Agreement; and

WHEREAS, Producer acknowledges and agrees that by virtue of employment with the Company, Producer will receive a direct financial benefit and other good and valuable consideration; and

WHEREAS, Producer hereby acknowledges and agrees that each of the Retention Payment and the Acquisition Bonus (as defined below) is a separate and additional payment to which Producer is not otherwise entitled and constitutes material and sufficient consideration to induce Producer to enter into this Agreement; and

WHEREAS, by virtue of past employment with Seller or any Predecessor and future employment with the Company, Producer:

(a) had, has, and will continue to have, as applicable, access to, and has gained and will continue to gain knowledge of, Confidential Information of the Company, any Predecessor and/or any other USI Company, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company or any other USI Company; and

(b) had, has, and will have, as applicable, significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to certain of the Company's customers and suppliers and, as such, has developed,

will continue to develop, or will develop close and direct relationships with such customers and suppliers; and

(c)  has developed, will continue to develop and/or will develop, as applicable, close and direct relationships with the officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations of the Company or any other USI Company; and

(d)  has benefitted, will continue to benefit and/or will benefit, as applicable, from the Company's investment of time, money and trust in Producer and will gain a high level of inside knowledge, influence, credibility, reputation or public persona as a representative or spokesperson of the Company, and, as a result, had, has, and will continue to have, the ability to harm or threaten the Company's legitimate business interests; and

(e)  has made use of, and will continue to make use of, Producer's significant skills, training and experience; and

(f)  for these and other reasons, will render services to the Company that Producer acknowledges are special, unique or extraordinary; and

WHEREAS, Producer acknowledges and agrees that the Company (on behalf of itself and the other USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the other USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests; and

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Producer's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

**AGREEMENT**

1.  **DEFINITIONS**.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them:

(a)  "**Active Prospective Client**" means any Person or group of Persons who the Company specifically solicited or had documented plans to solicit within the six (6) months preceding the termination of Producer's employment hereunder.

(b)  "**Cause**" shall mean (i) commission by Producer of a willful and material act of dishonesty in the course of Producer's duties hereunder; (ii) conviction of Producer

by a court of competent jurisdiction of a crime constituting a felony or conviction in respect of any act involving fraud, dishonesty or moral turpitude; (iii) Producer's performance under the influence of illegal drugs or the abuse of legal drugs, or continued habitual intoxication, during working hours, after the Company shall have provided notice to Producer and given Producer 30 days within which to commence rehabilitation with respect thereto, and Producer shall have failed to commence such rehabilitation or continued to perform under the influence after such rehabilitation; (iv) frequent or extended, and unjustifiable (not as a result of incapacity or disability) absenteeism which shall not have been cured within 30 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause, in the event such condition shall not have been cured; (v) Producer's personal, willful and continuing misconduct or gross negligence that is injurious to the Company's reputation or business; (vi) refusal to perform duties and responsibilities described in this Agreement (or as they may be assigned from time to time), or to carry out reasonable and lawful directives of the Regional CEO or such Regional CEO's designee; in each case which, if capable of being cured, shall not have been cured within 60 days after the Company shall have advised Producer of its intention to terminate Producer's employment for Cause; or (vii) material non-compliance with the terms of this Agreement.

(c)  "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by the Company for such carrier or other entity) which is or was serviced by the Company in connection with the Company's business, regardless of whether such services are provided by, or through the licenses of the Company or any shareholder, employee or agent of the Company.

(d)  "**Coded to Producer**" means all policies and other business coded to Producer, as determined in good faith by the Company based on standards generally used in the insurance industry.

(e)  "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product.  Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(f)  "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the Company, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's

employment with the Company, or about which Producer has acquired Confidential Information.

(g) "**Confidential Information**" means at any date, any information of the Company, any Predecessor and/or a USI Company to which Producer has access, that is not already generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to:    (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (ii) the types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iii) the terms and conditions of benefits and compensation plans of the Client Accounts or Active Prospective Clients of the Company or any Predecessor; (iv) the information furnished to the Company or any Predecessor in confidence by any Client Account or Active Prospective Client; (v) the business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company, its corporate affiliates or any Predecessor; (vi) the lists of the Client Accounts or Active Prospective Clients of the Company or any Predecessor, and any analyses and compilations thereof; (vii) data, analyses, lists and business methodologies regarding prospective employees, candidates or hiring targets of the Company; (viii) compilations and lists of names and other personally identifiable information regarding Company employees; (ix) information that is password-protected; (x) all internal memoranda and other office records, including without limitation electronic and data processing files and records; (xi) any and all other proprietary information of the Company, any Predecessor or a USI Company, including without limitation any information contained within a proprietary database and workbook product binders including without limitation OMNI Solutions Workbooks, OMNI Library Pages, OMNI Case Studies, and other OMNI Work Product; and (xii) any and all other information that constitutes a trade secret under applicable law.

(h) "**Effective Date**" means the Closing date.

(i) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's or any Predecessor's investment in repeated contacts, business transactions, Confidential Information, or other efforts to develop lasting relationships.

(j) "**Net Commissions and Fees**" means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to Producer, less payments to external service providers such as, but not limited to vendors and value-added service providers, and/or to other USI Companies, and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided for by local USI practice. "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

(k) "**New**" means any fees or policy lines of coverage for a new Client Account or any new fees or policy lines of coverage for an existing Client Account written by the Company or the other USI Companies, as the case may be. New will not encompass any Client Account for which similar fees or coverage was in-force in the previous twelve (12) months and such business will be considered Renewal business. For fees or policies with a coverage period of more than twelve (12) months, New shall be determined by the Company in accordance with the Company's policies in effect at such time.

(l) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(m) "**Predecessor**" means any Person, in its capacity as predecessor-in-interest to the assets of the Company, which shall be deemed to include, without limitation, CIS and the Seller.

(n) "**Producer's Book of Business**" means the annual Net Commissions and Fees received by the Company on Client Accounts Coded to Producer.

(o) "**Renewal**" means the second and any subsequent year of any New coverage. For policies or fee agreements with a coverage period of more than twelve (12) months, Renewal shall be determined by the Company in accordance with the Company's policies in effect at such time.

(p) "**USI Business**" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(q) "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware corporation ("**USI**"), its subsidiaries (including the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2.   **POSITION, RESPONSIBILITIES AND TERM**

2.1   ***Position and Responsibilities***.   On the terms and conditions in this Agreement, and conditioned upon the Closing, the Company shall employ Producer as a producer for the Company.  Producer shall perform all services and duties customarily attendant to such position and such other services and duties commensurate with such position as prescribed from time to time by Producer's Regional Chief Executive Officer or his/her designee (hereinafter, the "**Regional CEO**").   Nothing in this Agreement shall confer upon Producer any right to continued employment hereunder.

2.2   ***Insurance Licenses***.  Producer shall obtain and retain the proper licenses for all lines of insurance solicited and serviced by Producer.  Notwithstanding anything to the contrary in this Agreement, Producer acknowledges Producer is not entitled to any commissions for sales or servicing of policies within a line of insurance if Producer is not properly licensed for such line of insurance.

2.3   ***No Conflicts of Interest***.   During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company, unless disclosed to and agreed to by the Regional CEO and Chief Compliance Officer in writing.  Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4   ***Duty of Loyalty***.  Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of the Company and any other USI Company.

2.5   ***Term***.  Producer's employment hereunder shall commence on the Effective Date and continue until terminated pursuant to Section 9 (the "**Term**").

3.   **COMPENSATION AND BENEFITS**

3.1   ***Draw***.  The Company agrees to pay Producer commissions, calculated pursuant to Section 3.2, and a recoverable draw against such future commissions in an amount determined by the Company based on Producer's Book of Business ("**Draw**"); provided, however, that the Company may adjust Producer's Draw upward or downward in its discretion to fairly reflect the commissions Producer will likely earn based on Producer's Book of Business.   The Draw shall be offset by commissions earned by Producer pursuant to this Agreement.  The Draw will be payable in equal installments by the Company (or another USI Company designated by the Company) according to its normal payroll practices.

3.2   ***Calculation of Commissions***.   The Company agrees to pay Producer commissions calculated in accordance with the following policies:

(a)   Forty percent (40%) of annual Net Commissions and Fees received by the Company on Client Accounts for New policies (except thirty percent (30%) on New Surety business, Builders Risk business, and WRAP products), subject to Section 3.2(d) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer.   In connection with New policies, if there is more than one originating/selling/servicing producer, the respective producers shall mutually agree to the commission split provided that the aggregate amount paid shall not exceed the percentages set forth in this provision.   For the avoidance of doubt, Producer shall not be paid commissions for New policies on accounts below the account minimums set forth in Section 3.2(d) below.

(b)   Twenty-five percent (25%) of annual Net Commissions and Fees received by the Company on Client Accounts for Renewal policies (except thirty percent (30%) on Renewal Surety business, Builders Risk business, and WRAP products, and zero percent (0%) on Renewals of personal lines policies), subject to Section 3.2(d) below, assigned and Coded to Producer as the sole originating/selling and sole servicing producer.   In connection with Renewal policies, if there is more than one originating/selling/servicing producer, the respective producers shall mutually agree to the commission split provided that the aggregate amount paid shall not exceed the percentages set forth in this provision.   For the avoidance of doubt, Producer shall not be paid commissions for (i) Renewal policies on personal lines policies or (ii) accounts that fall below the account minimums set forth in Section 3.2(d) below.

(c)   An amount determined by the Company's policies then in effect on Client Accounts, including cross-sold business and transferred business, for which Producer is not both the sole originating/selling producer and the sole servicing producer.

(d)   No commission will be paid on Client Accounts Coded to Producer that generate annual Net Commissions and Fees of less than Five Thousand Dollars ($5,000) on commercial property and casualty, Ten Thousand Dollars ($10,000) on employee benefits or One Thousand Dollars ($1,000) on personal lines (including farm accounts).   There shall be no account minimum on surety products.   Client Accounts that are linked by a common owner or common purchaser shall have policies and fees within the same line of business (i.e., commercial property and casualty; employee benefits; etc.) aggregated for purposes of determining whether the minimum account revenue for such individual line of business has been reached.

(e)   Producer's commissions shall be reduced by payments to co-brokers, sub-brokers, and sub-producers (including commissions and fees), referral fees, and return commissions, so that the Company's total payments to all Persons from the Net

Commissions and Fees do not exceed any applicable maximum commission percentages under Company policy as amended from time to time.

(f) Producer's commissions shall be reduced by, and Producer shall have an ongoing duty to return to the Company, any commissions previously paid to Producer on premiums or fees subsequently refunded or not collected by the Company.

(g) Producer's commissions shall not be considered earned until all charges and/or deductions have been made pursuant to this Agreement and the Company's compensation policies.  In addition, such commissions only become earned by Producer if:  (i) the business transaction is completed during Producer's employment hereunder; and (ii) Producer is still employed hereunder on the date the Company receives such commissions.

3.3  ***Payment of Commissions***.  The Company shall calculate, no less often than quarterly, commissions earned by Producer and received by the Company.  Earned commissions shall be offset against Producer's Draw for the prior periods.  Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after each quarter.  If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall may be offset against installments of Producer's Retention Payment under Section 4 and/or installments of Producer's Draw for subsequent quarters and Producer's Draw for the subsequent quarter may be reduced commensurate with current earned commission levels to minimize the risk of a shortfall in the new period.

3.4  ***Commissions Upon Termination***.  Producer acknowledges that Producer shall not be eligible to earn or receive any commissions received by the Company after Producer is no longer employed hereunder because Producer will no longer be performing the essential duties of Producer's position which form the basis for such compensation. Accordingly, if Producer's employment hereunder is terminated for any reason, including death, the Company shall calculate commissions earned by Producer and received by the Company prior to Producer's termination.  Earned commissions shall be offset against Producer's Draw for the prior periods.  Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after the effective date of Producer's termination.  No further commissions shall be due or payable after such payment.  If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall shall be due and payable to the Company within sixty (60) days after the effective date of Producer's termination, except in the case of death or permanent disability whereby any shortfall will not be due and payable to the Company by such former Producer or their estate/representative.

3.5   *Right to Modify*.  The Company may modify the policies and terms in Section 3 by giving at least thirty (30) days written notice to Producer, provided, however, that the Company may not modify the commission percentages set forth in Section 3.2(a) and 3.2(b) prior to the end of the Measurement Period without Producer's consent.  For the avoidance of doubt, the Company may modify any commission percentages following the end of the Measurement Period.   Producer's continued employment hereunder following any change shall be considered sufficient consideration for, and acceptance of, such change.

3.6   *Tax Withholding*.  The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.7   *Benefits*.  Producer shall be entitled to benefits, other than paid time off, on the same terms generally provided to similar employees of the Company.  Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for producers of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.8   *Paid Time Off*.  Producer shall not accrue or be entitled to any paid time off ("**PTO**") under this Agreement or the Company's PTO policy.

4.   **RETENTION BONUS PAYMENT.**  Producer shall be eligible for a special retention bonus payment (the "**Retention Payment**").

4.1   *Amount.*  The amount of the Retention Payment shall be equal to fifty percent (50%) of the average annual Net Commissions and Fees received by the Company (subject to the exceptions set forth at the end of this Section 4.1) in each case, for Client Accounts assigned and Coded to Producer (for the avoidance of doubt, in the case of commission splits, only with respect to the portion Coded to Producer) during each of (a) the period beginning on the first anniversary of the Effective Date and ending one (1) day prior to the second anniversary of the Effective Date, (b) the period beginning on the second anniversary of the Effective Date and ending one (1) day prior to the third anniversary of the Effective Date and (c) the period beginning on the third anniversary of the Effective Date and ending one (1) day prior to the fourth anniversary of the Effective Date (collectively, the "**Measurement Period**").  By way of example, if the Effective Date is May 1, 2018, and Net Commissions and Fees in Producer's Book of Business (subject to the exceptions set forth at the end of this Section 4.1) are $900,000 for the year beginning May 1, 2019 and ending April 30, 2020, $1,000,000 for the year beginning May 1, 2020 and ending April 30, 2021, and $1,100,000 for the year beginning May 1, 2021 and ending April 30, 2022, the amount of the Retention Payment would be $500,000 (the average of $900,000, $1,000,000 and $1,100,000 equals $1,000,000,

multiplied by fifty percent (50%) equals thereto). When calculating the Net Commissions and Fees received by the Company, the following Net Commissions and Fees shall be excluded and not counted toward the Retention Payment (i) Client Accounts transferred to Producer by the Company or a USI Company after the Effective Date, (ii) life insurance, other heaped commission life and health insurance products, and any heaped commission property and casualty insurance products, (iii) Net Commissions and Fees for Client Accounts that do not meet the account minimums required to receive commissions as set forth in this Agreement, any amendment thereto or any modification pursuant to Section 3.5, and (iv) large, non-recurring, and unusual commissions and fees, each as reasonably determined by the Company.

4.2   ***Timing and Eligibility.*** The Company shall pay Producer fifty percent (50%) of the Retention Payment within forty-five (45) days following the end of the Measurement Period, and the remaining fifty percent (50%) of the Retention Payment shall be paid to Producer on the payroll date immediately following the first anniversary of the payment of the first installment.  Continuing on with the example in Section 4.1 above, the first installment of $250,000 would be paid within forty-five (45) days after April 30, 2022, and the remaining installment of $250,000 would be paid on the payroll date immediately following the one (1) year anniversary of the date of payment of the first installment.  If Producer's employment with the Company terminates or Producer is not actively employed on the dates the installment payments under this Section 4.2 are due, Producer shall not earn or be paid such installment.  Notwithstanding the foregoing, if Producer is employed by the Company as of the last day of the Measurement Period and the Company thereafter terminates Producer's employment without Cause, or Producer's employment terminates by reason of death or disability, or if Producer becomes employed by a successor or assign of the Company, then Producer or Producer's estate shall nevertheless be eligible to receive any installment payment Producer would otherwise be eligible to receive, in accordance with the timetable set forth in this Section 4.2.  For the avoidance of doubt, if (i) the Company terminates Producer's employment with Cause before or after the Measurement Period, (ii) Producer resigns or terminates employment for reasons other than death or disability after the Measurement Period, or (iii) Producer is not actively employed with the Company for any reason before the end of the Measurement Period, then in each case, Producer shall not earn or be paid any installment of the Retention Payment that Producer has not already been paid.  Each installment of the Retention Payment is subject to offset as set forth in Section 3.3.

5. **ACQUISITION BONUS**

5.1   ***Acquisition Bonus.***   The Company shall pay Producer $223,050 (the "**Acquisition Bonus**") payable in three (3) equal installments of $74,350 on the payroll immediately following each of the following dates: (i) thirty (30) days after the Effective Date, (ii) the

first anniversary of the Effective Date and (iii) the second anniversary of the Effective Date.

5.2   ***Eligibility for Acquisition Bonus***.   Notwithstanding the foregoing, if Producer's employment with the Company terminates or Producer is not actively employed for any reason on the dates the installment payments under Section 5.1 are due, Producer shall not earn or be paid such installment.

6.   **EXPENSES**.  During the Term, the Company shall reimburse Producer, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses reasonably and properly incurred by Producer in connection with the performance of Producer's duties hereunder and the conduct of the business of the Company.

7.   **COMPANY PROPERTY**.  Producer acknowledges and agrees all Confidential Information of the Company, including information transferred from any Predecessor under the Purchase Agreement, and/or of the USI Companies, which Producer has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Producer's employment.  Producer further acknowledges and agrees that Producer has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

8.   **COVENANTS**

8.1   ***Confidential Information***.  The Company agrees to provide Producer with Confidential Information to assist Producer in the course and scope of Producer's duties.  The Parties hereto agree that the Company's agreement to provide this Confidential Information to Producer is in consideration for, material to and ancillary to, Producer's agreement to the other terms in this Agreement.

8.2   ***Confidentiality During and Following Term***.  During the Term and for five (5) years after Producer is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company, any Predecessor or any USI Company except:  (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).  Notwithstanding anything in this Agreement to the contrary, nothing contained herein prohibits Producer from reporting, without the prior authorization of the Company and without notifying the Company, possible violations of Federal law or regulation to the United States Securities and Exchange Commission, the United States Department of Justice, the United States Congress or other governmental agency having apparent supervisory authority over the business of

the Company, or making other disclosures that are protected under the whistleblower provisions of Federal law or regulation.

8.3   ***Defend Trade Secrets Act Required Notice***.  Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Producer acknowledges and understands that:

(a)   An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:  (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b)   An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual:  (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

8.4   ***Assignment and Ownership of Intellectual Property***.   Producer acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law.  To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Producer is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Producer hereby irrevocably transfers and assigns to the Company all rights, title and interest Producer may have or acquire to such Intellectual Property, without additional compensation, and hereby irrevocably waives any so-called moral rights of authors or other special rights which Producer may have or acquire therein.  "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Producer in whole or in part during Producer's employment with the Company or any Predecessor:  (a) using Producer's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Producer's work for the Company.

8.5   ***Non-Solicitation of Clients and Active Prospective Clients***.   In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a)   During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

(b)   During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

8.6   ***Non-Acceptance / Non-Service of Clients and Active Prospective Clients***.   In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that:

(a)   During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained

Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

(b)   During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

8.7   *Non-Interference With Employees*.  In consideration of Producer's employment with the Company, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employee to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company or any Predecessor.

8.8   *Tolling*.  Producer agrees the duration of the covenants in this Agreement shall be extended by any period of time in which Producer is in breach of any such obligations and the extended duration shall be measured from the date of the court order granting injunctive relief.

8.9   *Purpose of Restrictions*.  The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Producer's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill.  Producer agrees that the time and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

8.10   *Modification*.  If a court finds any covenants in this Agreement exceed the permissible time or scope limitations, such covenants shall be reformed to the maximum permissible time or scope limitations.  If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the minimum extent necessary to permit the remaining terms to be enforced.  The Company may unilaterally limit the scope of these covenants.

8.11 **Independent Enforcement**.  Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Producer against the Company or any other USI Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Producer or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 8 of this Agreement.  The Company shall not be barred from enforcing any of the covenants in Section 8 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Producer.

9. **TERMINATION**

9.1 **Termination by the Company**.  The Company may terminate Producer's employment hereunder by giving written notice to Producer.  The termination of employment shall be effective on the date specified in such notice.

9.2 **Termination by Producer**.  Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company.  The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may:  (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

9.3 **Payments Upon Termination**.  If Producer's employment hereunder is terminated pursuant to Section 9, the Company shall:  (a) reimburse Producer for any expenses properly incurred through the date of termination pursuant to Section 6; and (b) pay Producer any earned and payable commissions through the date of termination (in excess of Producer's Draw and any other applicable offsets) pursuant to Section 3.4.

9.4 **Miscellaneous Termination Provisions**.  Upon termination of Producer's employment hereunder, Producer hereby irrevocably promises to:

(a) Immediately return to the Company any and all property of any of the USI Companies in Producer's possession or control, including electronic devices and equipment, corporate credit cards and building keys, including any and all such property acquired as a result of employment with any Predecessor.

(b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information, including any and all such materials acquired as a result of employment with any Predecessor.

(c) Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

(d) For two (2) years after Producer is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 8 of this Agreement prior to taking any position with such new employer.

(e) Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

10. **REMEDIES**.  Producer acknowledges:  (a) the services to be rendered by Producer are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Producer's breach of Section 8 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation. Accordingly, Producer agrees, if Producer violates Section 8 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.  Producer agrees to waive any requirement for the Company to post a bond.

11. **ENTIRE AGREEMENT**.  No agreements or representations, oral or otherwise, express or implied, have been made with respect to Producer's employment hereunder except as set forth in this Agreement.  This Agreement supersedes and preempts any prior oral or written understandings, agreements or representations by or between Producer and the Company or any Predecessor, including without limitation, any previous employment or other similar agreement between the Producer and the Company or any Predecessor, which may have related to the subject matter hereof in any way.

12. **AMENDMENT**.  Except as set forth in Sections 3.5, 8.10, 14, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

13. **GOVERNING LAW**.  This Agreement shall be governed by and construed in accordance with the laws of the State of Idaho, without regard to principles of conflicts of law.

14. **SEVERABILITY**.   The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable.  In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the minimum extent and in the manner necessary to render it valid, legal, and enforceable.  If such provision cannot under any circumstances be

so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

15. **WAIVERS**.   No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.   Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

16. **ASSIGNMENT**.  Producer may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company. Producer's obligations under this Agreement inure to the Company, its successors and assigns.   The Company may, at any time and without Producer's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor.  Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the Effective Date.

**USI INSURANCE SERVICES LLC**

By: _____
    Ernest J. Newborn, II
    SVP, General Counsel & Secretary

**PRODUCER**

By: _____
    Lee Tilleman

Lee Tilleman
Producer
(USI ID)
NAI-1503617860v1



USI Insurance Services
601 Union Street
Suite 1000
Seattle, WA 98101
www.usi.com
Tel: 206.441.6300

October 16, 2020

Lee Tilleman

RE: Change of Region- Mountain to Northwest

Dear Lee:

This letter will confirm our conversation that, effective January 1, 2021, your Producer position is being transferred from the Mountain Region to the Northwest Region.  As a result, the legal entity that you are employed by will change from USI Insurance Services LLC ("USI") to Kibble & Prentice Holding Company d/b/a USI Insurance Services Northwest ("K&P"), a wholly owned subsidiary of USI.

The employment agreement between you and USI, as amended ("Agreement") will be assigned to K&P, effective January 1, 2021.  You do not need to take any actions regarding this assignment or change. Effective January 1, 2021, you will report to Gary Patterson, NW Regional Commercial Lines Practice Leader, Seattle, Washington.

Except as noted herein, all terms and conditions of your Agreement remain in effect.  Nothing in this letter changes your at-will employment relationship with the Company.

Please sign, date and return this letter to me to acknowledge your receipt and understanding. If you have any questions, please contact me.

Thank you,

*Matt Armstrong*

Matt Armstrong
Chief HR Officer NW Region

RECEIVED & UNDERSTOOD:

_____*Lee Tilleman*_____

Lee Tilleman

_10-21-2020_____
Date

Property & Casualty · Employee Benefits · Personal Risk · Retirement Consulting

The USI ONE Advantage®

# EXHIBIT

# A - 2

**From:** Lee Tilleman <Lee.Tilleman@usi.com>
**Sent:** Wednesday, February 3, 2021 4:57:39 PM
**To:** Gary Patterson <Gary.Patterson@usi.com>
**Subject:** Resignation

Gary,

Please accept this email as written notice of my resignation, effective immediately, February 3, 2021. I expect to be paid for my earned and payable commissions up to the end of today, February 3rd. I have the following items of company property in my possession: Surface, Docking station, Printer, two monitors, office phone, and miscellaneous paper files (all other documentary materials have been destroyed). Please let me know how you would like these items returned or if you want me to destroy them. I have removed the email app from my phone and will no longer be monitoring or responding to any emails sent to my USI email address. In closing, should you have any questions, please direct them to my attorney, Regina McCrea of Owens, McCrea & Linscott. 208-762-0203.

Thank you for the opportunity to work with you and your region the past 5 months.


LEE TILLEMAN

1

National Broker
USI Insurance Services
3974 Ridgewater Drive, Lewiston, ID 83501
c: 612.325.8618 | f: 610.537.2060 | VOIP 6125094241

Lee.Tilleman@usi.com | www.usi.com





USI NAMED ONE OF FORBES 300 BEST LARGE EMPLOYERS IN AMERICA IN 2018!

THE USI ONE ADVANTAGE®
Our Approach to Delivering Client Solutions ► Watch Video

*Please note that you may not rely on email communication to us to report a claim or to give us instructions to place, bind, change or terminate coverage unless we have subsequently confirmed to you in writing that we have received your message and will be taking the action you have requested.*

*Confidentiality Notice: The information contained in this email message including any attachments is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient and have received this communication in error, please contact the sender by reply email and destroy all copies of the original message. Thank You.*

# EXHIBIT

# A - 3

## Contact

www.linkedin.com/in/lee-tilleman-
cic-crm-44446720 (LinkedIn)
www.usi.com (Company)

### Top Skills

Commercial Insurance
Property & Casualty Insurance
Brokers

### Certifications

Certified Insurance Counselor
Certified Risk Manager

# Lee Tilleman, CIC, CRM

Vice President at Alliant Insurance Services
Lewiston

## Summary

30 years of providing Risk Management Solutions and the best client service in the marketplace.  Focused on clients in the Commercial Ag, Energy, and Food industries.

_____

## Experience

**Alliant Insurance Services**
Vice President
February 2021 - Present (1 month)
Lewiston, Idaho, United States

**USI Insurance Services**
Property & Casualty Consultant at USI Insurance Services
May 2018 - February 2021 (2 years 10 months)
Lewiston, Idaho

**CHS Insurance now USI Insurance Services**
Broker
February 1994 - May 2018 (24 years 4 months)
St Paul, MN

CHS Insurance is a full service insurance broker specializing in agriculture related commercial businesses.

**The Mill Mutuals**
Field Representative
December 1991 - February 1994 (2 years 3 months)
Moscow, ID

Sales, Loss Control, Rating, Claims

_____

## Education

**Washington State University**
Bachelor of Arts in Business Administration, Finance · (1987 - 1991)

# EXHIBIT

# A - 4



USI Insurance Services
601 Union Street
Suite 1000
Seattle, WA 98101
www.usi.com
Tel: 206.441.6300

February 4, 2021

**Via USPS (Registered)**

Lee Tillman
3974 Ridgewater Drive
Lewiston, ID 83501

Dear Lee,

This letter will confirm receipt of your letter resigning your employment with Kibble & Prentice Holding Company d/b/a USI Insurance Services Northwest (the "Company") effective as of the close of business on February 3, 2021. Pursuant to Section 9.2 of your employment agreement with the Company effective May 4, 2018, ("Employment Agreement"), you are required to provide the Company with sixty (60) days notice of your resignation. Therefore, your resignation will become effective as of the close of business on April 3, 2021.

You will remain an employee of the Company until the effective resignation date, and we expect you to assist with the transition of accounts as directed by your manager [or other applicable person].  The Company will continue to pay you during your transition period in accordance with your enclosed Employment Agreement with the Company dated May 4, 2018, as amended ("Employment Agreement").  As a reminder, you are required to honor the obligations set forth in the Employment Agreement, including those set forth in Sections 7, 8 and 9 of the Employment Agreement, which continue during your transition period and following your effective resignation date.

The Company is also prepared to fully enforce its rights should it determine that you are engaged in any violation of the Agreement.

Please contact me if you have any questions at (206) 676-5670, and/or email at matt.armstrong@usi.com.


Sincerely,

Matt Armstrong
Chief HR Officer NW Region

Encl.
cc:  HR File:
February 04,2021

# EXHIBIT

# A - 5



P.O. Box 2950
Hartford, CT 06104-2950

**Kelly Ziemann**
**PO Box 64094**
**St. Paul, MN 55102-0094**
**(925) 945-4006**
**(925) 945-4423**
**KZIEMANN@travelers.com**

**February 15, 2021**

**USI INS SERVICES LLC**
**8000 NORMAN CTR DR STE 400**
**BLOMMINGTON, MN 55437**

Re:     **Request to Change Agency**

Insured:  **AG LINK, INC**

Effective date of change:  **December 1, 2021**

Policy Number(s): **107179541**

Dear Agent:

This insured has requested that we recognize a new Agency of Record on the above policy(ies). We will suspend processing this change for five business days from the date of this letter, allowing you to consult with the insured and discuss the possibility of a Countermanding Letter.

If we receive a Countermanding Letter on or before **February 23, 2021,**  we will not process the change. To facilitate matters, please fax or scan and email a copy to our attention.

If we do not receive a Countermanding Letter, the policy(ies) listed above will continue to their expiration date but will not be renewed for your agency. Until expiration:

· We will accept direction from your agency on any changes effective prior to the policy's expiration date.

· You will receive credit for all gross, net and earned premiums.

· All policies subject to audit will be adjusted to reflect the actual exposure. These audits will be processed through your agency.

· You are entitled to commission on all premium booked and paid.

· You will be charged with any losses, including subsequent changes in reserves.

If you have any questions, please contact me at **(925) 945-4006**

Sincerely,

**Kelly Ziemann**

LTR-4016 Rev. 02-13
©2013 The Travelers Indemnity Company.  All rights reserved.

Date: 02-17-2021
To: USI INSURANCE SERVICES LLC
From:  Specialty Underwriting
Subject:  ***Change of Producer***

     Name of Insured: Co Grain Inc
     Effective Date: 11-01-2020 to 11-01-2021
     Policy Number(s):  LHX D419946 03

Dear *Original Agent*:

The above named insured has requested we recognize a new Broker of Record on this business as of the effective date indicated above.

As a result of this request, we will suspend further processing of this change for ten (10) working days from the date of this letter to allow you time to consult with the Insured and obtain a countermanding order.  If we receive a countermanding order within this time frame we will not process the change. If, however, a countermanding order is NOT received, we will no longer be able to accept direction from you on this business as of the effective date indicated above and all transactions will be processed for the account of the new Broker of Record.

Should you have any questions, please feel free to call.

Sincerely,


The Hanover Insurance Co

hanover.com | The Hanover Insurance Company
440 Lincoln Street, Worcester, MA 01653 | Citizens Insurance Company of America
808 Highlander Way, Howell, MI 48843

701-0016 (12/13)

Date: 02-17-2021
To: USI INSURANCE SERVICES LLC
From:  Specialty Underwriting
Subject:  ***Change of Producer***

      Name of Insured: HIGHLINE GRAIN GROWERS INC
      Effective Date: 04-01-2020 to 04-01-2021
      Policy Number(s):  LHX D860900 02

Dear *Original Agent*:

The above named insured has requested we recognize a new Broker of Record on this business as of the effective date indicated above.

As a result of this request, we will suspend further processing of this change for ten (10) working days from the date of this letter to allow you time to consult with the Insured and obtain a countermanding order.  If we receive a countermanding order within this time frame we will not process the change. If, however, a countermanding order is NOT received, we will no longer be able to accept direction from you on this business as of the effective date indicated above and all transactions will be processed for the account of the new Broker of Record.

Should you have any questions, please feel free to call.

Sincerely,


The Hanover Insurance Co

---

h a n o v e r . c o m  |  **The Hanover Insurance Company**  |  **Citizens Insurance Company of America**
440 Lincoln Street, Worcester, MA 01653   808 Highlander Way, Howell, MI 48843

701-0016 (12/13)



**TRAVELERS**
P.O. Box 2950
Hartford, CT 06104-2950

**Kelly Ziemann**
**PO Box 64094**
**St. Paul, MN 55102-0094**
**(925) 945-4006**
**(925) 945-4423**
**KZIEMANN@travelers.com**


**February 15, 2021**

**USI INS SERVICES LLC**
**8000 NORMAN CTR DR STE 400**
**BLOMMINGTON, MN 55437**


Re:      **Request to Change Agency**

         Insured:  **Lewis-Clark Terminal, Inc**

         Effective date of change:  **May 31, 2021**

         Policy Number(s): **106736058**

Dear Agent:

This insured has requested that we recognize a new Agency of Record on the above policy(ies). We will suspend processing this change for five business days from the date of this letter, allowing you to consult with the insured and discuss the possibility of a Countermanding Letter.

If we receive a Countermanding Letter on or before **February 23, 2021,**  we will not process the change. To facilitate matters, please fax or scan and email a copy to our attention.


If we do not receive a Countermanding Letter, the policy(ies) listed above will continue to their expiration date but will not be renewed for your agency. Until expiration:

· We will accept direction from your agency on any changes effective prior to the policy's expiration date.

· You will receive credit for all gross, net and earned premiums.

· All policies subject to audit will be adjusted to reflect the actual exposure. These audits will be processed through your agency.

· You are entitled to commission on all premium booked and paid.

· You will be charged with any losses, including subsequent changes in reserves.

If you have any questions, please contact me at **(925) 945-4006**

Sincerely,

**Kelly Ziemann**

LTR-4016 Rev. 02-13
©2013 The Travelers Indemnity Company.  All rights reserved.


P.O. Box 2950
Hartford, CT 06104-2950

**Kelly Ziemann**
**PO Box 64094**
**St. Paul, MN 55102-0094**
**(925) 945-4006**
**(925) 945-4423**
**KZIEMANN@travelers.com**

**February 15, 2021**

**USI INS SERVICES LLC**
**8000 NORMAN CTR DR STE 400**
**BLOMMINGTON, MN 55437**

Re:      **Request to Change Agency**
         Insured: **MOUNTAIN VIEW CO-OP**

         Effective date of Agent of Record letter: **February 10, 2021**
         Expiration date: **July 01, 2021**
         Policy Number(s): **106946788**

Dear Agent:

This insured has requested that we recognize a new Agency of Record on the policy(ies) listed above. We will suspend processing this change for five business days from the date of this letter, allowing you to consult with the insured and discuss the possibility of a Countermanding Letter.

If we receive a Countermanding Letter on or before **February 23, 2021** we will not process the change. To facilitate matters, please fax or scan and email a copy to our attention.

If we do not receive a Countermanding Letter, the policy(ies) listed above will continue with your agency to expiration but will not be renewed for your agency. However, we will accept direction from the new agency for changes effective subsequent to the effective date of the Agency of Record letter and such changes will be processed on the policy(ies) listed above. Until expiration:

- You are entitled to commission on all premium booked and paid.
- You will receive credit for all gross, net and earned premiums. You will receive copies of all endorsements. You remain responsible for billing, collection and remittance of all endorsement transactions, including those requested by the new Agent of Record.
- All policies subject to audit will be adjusted to reflect the actual exposure. These audits will be processed and billed through your agency.
- You will be charged with any losses prior to expiration, including subsequent changes in reserves.
- Any contingent compensation agreements will reflect premium and losses as stated above.

If you have any questions, please contact me at **(925) 945-4006**

Sincerely,

**Kelly Ziemann**

---

LTR-4020 Rev. 02-13
©2013 The Travelers Indemnity Company. All rights reserved.



P.O. Box 2950
Hartford, CT 06104-2950

**Kelly Ziemann**
**PO Box 64094**
**St. Paul, MN 55102-0094**
**(925) 945-4006**
**(925) 945-4423**
**KZIEMANN@travelers.com**

**February 15, 2021**

**USI INS SERVICES LLC**
**8000 NORMAN CTR DR STE 400**
**BLOMMINGTON, MN 55437**

Re:      **Request to Change Agency**

Insured:  **Tri-State Seed Company, LLC**

Effective date of change:  **March 1, 2021**

Policy Number(s): **105639412**

Dear Agent:

This insured has requested that we recognize a new Agency of Record on the above policy(ies). We will suspend processing this change for five business days from the date of this letter, allowing you to consult with the insured and discuss the possibility of a Countermanding Letter.

If we receive a Countermanding Letter on or before **February 23, 2021,** we will not process the change. To facilitate matters, please fax or scan and email a copy to our attention.

If we do not receive a Countermanding Letter, the policy(ies) listed above will continue to their expiration date but will not be renewed for your agency. Until expiration:

·  We will accept direction from your agency on any changes effective prior to the policy's expiration date.

·  You will receive credit for all gross, net and earned premiums.

·  All policies subject to audit will be adjusted to reflect the actual exposure. These audits will be processed through your agency.

·  You are entitled to commission on all premium booked and paid.

·  You will be charged with any losses, including subsequent changes in reserves.

If you have any questions, please contact me at **(925) 945-4006**

Sincerely,

**Kelly Ziemann**



P.O. Box 2950
Hartford, CT 06104-2950

**Kelly Ziemann**
**PO Box 64094**
**St. Paul, MN 55102-0094**
**(925) 945-4006**
**(925) 945-4423**
**KZIEMANN@travelers.com**

**February 15, 2021**

**USI INS SERVICES LLC**
**8000 NORMAN CTR DR STE 400**
**BLOMMINGTON, MN 55437**

Re:     **Request to Change Agency**

       Insured:  **Uniontown Co-Operative Association**

       Effective date of change:  **May 31, 2021**

       Policy Number(s): **105616176**

Dear Agent:

This insured has requested that we recognize a new Agency of Record on the above policy(ies). We will suspend processing this change for five business days from the date of this letter, allowing you to consult with the insured and discuss the possibility of a Countermanding Letter.

If we receive a Countermanding Letter on or before **February 23, 2021,**  we will not process the change. To facilitate matters, please fax or scan and email a copy to our attention.

If we do not receive a Countermanding Letter, the policy(ies) listed above will continue to their expiration date but will not be renewed for your agency. Until expiration:

·   We will accept direction from your agency on any changes effective prior to the policy's expiration date.

·   You will receive credit for all gross, net and earned premiums.

·   All policies subject to audit will be adjusted to reflect the actual exposure. These audits will be processed through your agency.

·   You are entitled to commission on all premium booked and paid.

·   You will be charged with any losses, including subsequent changes in reserves.

If you have any questions, please contact me at **(925) 945-4006**

Sincerely,

**Kelly Ziemann**

# EXHIBIT

# A - 6

**From:** Regina McCrea <<u>rmccrea@omllaw.com</u>>
**Sent:** Tuesday, February 9, 2021 2:18 PM
**To:** Clagg, Jason <<u>Jason.Clagg@btlaw.com</u>>
**Cc:** <u>leetilleman@frontier.com</u>
**Subject:** [EXTERNAL]Re: Fw: Reminder of Covenants Letter

Jason,

My client received the below email from USI, and I am responding to the same.  USI was previously advised that I represent its former employee, Lee Tilleman.  Mr. Tilleman unequivocally resigned his position on February 3, 2021.  Therefore, contrary to USI's stated position, he is no longer an employee as of February 4, 2021 and is not to be paid following the effective date of his resignation.  Also, he has requested guidance from USI on returning its property and has not received a response.  Please let me know how USI would like that handled.  Last, I'd ask USI to direct all further communication to me as Mr. Tilleman's legal representative.

Thank you for your prompt attention to and cooperation with the above requests.

Regards,
Regina

**Regina M. McCrea**
Attorney at Law



6500 N. Mineral Drive, Suite 103
Coeur d'Alene, ID  83815
Phone: 208-762-0203
Fax:  208-762-0303

# EXHIBIT

# A - 7

# BARNES & THORNBURG LLP

One North Wacker Drive
Suite 4400
Chicago, Illinois 60606-2833
312-357-1313
312-759-5646 (Fax)

www.btlaw.com

Lindsey D. G. Dates
(312) 214-4855
ldates@btlaw.com

February 11, 2021

**VIA E-MAIL**

Regina M. McCrea
6500 N. Mineral Drive, Suite 103
Coeur d'Alene, ID  83815
rmccrea@omllaw.com

      Re:    *Lee Tilleman's USI Employment Obligations*

Dear Ms. McCrea:

      I write in response to your February 9, 2021 e-mail to my partner, Jason Clagg.  Please direct all future correspondence to me.

      In your February 9, 2021 e-mail, you assert that Mr. Tilleman's employment with USI terminated on February 3, 2021.  That is not correct.  In Section 9.2 of his Employment Agreement (the "Agreement"), Mr. Tilleman expressly agreed to give USI "at least sixty (60) days written notice."  (*See* Ex. A.)  In accordance with Section 9.2, that contractually mandated 60-day notice period ends on April 3, 2021, not February 3, 2021.  The 60-day period is important.  Among other things, it helps ensure a smooth transition to other USI team members and limits the risk of service disruption for USI's clients.

      Consistent with Section 9.2 of the Agreement, Section 9.3 provides that USI shall "reimburse Producer for any expenses properly incurred" and "pay [him] any earned and payable commissions" through April 3, 2021.  Pursuant to Section 9.3, therefore, USI shall continue to pay Mr. Tilleman through April 3, 2021.

      The Agreement also contains additional covenants and obligations applicable to Mr. Tilleman, the violation of which would cause irreparable harm and damage to USI.[1]  Upon

---

[1] Please view this correspondence as formal notice of Mr. Tilleman's obligation to preserve any and all documents (including any e-mails or other electronically stored information he may have) concerning or relating, in any way, to USI (and its predecessors), his employment with USI (and its predecessors), any negotiations or communications he may have had with Alliant Insurance Services, Inc., or any other competitors regarding USI, its confidential, proprietary, and trade secret information, clients, and/or employees.  Further, Mr. Tilleman is hereby put on notice to disable any auto-delete or override functions relative to any and all of his electronic devices on which electronically stored information involving this matter may exist including, but not limited to, his computers, servers, laptops, PDAs, mobile phones, and web accounts.  Please understand that USI will treat any failure to preserve this evidence as an intentional act to destroy it.

information and belief, Mr. Tilleman has already begun soliciting/accepting USI clients in violation of the covenants and obligations he agreed to in the Agreement including, but not limited to, those in Sections 8.5 and 8.6.  USI demands that Mr. Tilleman immediately cease and desist and expressly reserves all rights and remedies it may have with respect to any breaches of the Agreement by Mr. Tilleman.

Finally, although the 60-day notice period does not end until April 3, 2021, and without waiving any rights or remedies under the Agreement, USI is willing to accommodate Mr. Tilleman's request to return USI property and confidential information in his possession or control. I will provide details for the return of that property and information.

Sincerely,

*Lindsey D. G. Dates*

Lindsey D. G. Dates