**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| KIBBLE & PRENTICE HOLDING COMPANY, d/b/a USI INSURANCE SERVICES NORTHWEST,<br><br>        Plaintiff,<br><br>        vs.<br><br>LEE TILLEMAN,<br><br>        Defendant.<br>_____ | ) Case No. 3:21-cv-00083-BLW<br>)<br>) **MOTION FOR TEMPORARY**<br>) **RESTRAINING ORDER AND**<br>) **PRELIMINARY INJUNCTION**<br>)<br>)<br>)<br>)<br>)<br>) |

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE B. LYNN WINMILL**
**THURSDAY, FEBRUARY 25, 2021; 9:00 A.M.**
**BOISE, IDAHO**

Proceedings recorded by digital audio recording, transcript produced by computer.
_____

**TAMARA I. HOHENLEITNER, CSR 619, CRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO  83724

1                         A P P E A R A N C E S

2

3     **FOR PLAINTIFF**
             D. John Ashby
4            HAWLEY TROXELL ENNIS & HAWLEY LLP
             877 Main Street, Suite 1000
5            Boise, ID 83701-1617

6            Lindsey D.G. Dates
             BARNES & THORNBURG LLP
7            1 N. Wacker Dr., Suite 4400
             Chicago, IL 60606

8

      **FOR DEFENDANT**
9            Regina Michele McCrea
             OWENS MCCREA & LINSCOTT PLLC
10           6500 N. Mineral Dr., Suite 103
             Coeur d'Alene, ID 83815

11

             Seth M. Gerber
12           MORGAN LEWIS BOCKIUS LLP
             2049 Century Park E, Suite 700
13           Los Angeles, CA 90067-3109

14

15

16

17

18

19

20

21

22

23

24

25

```
              I N D E X

           FEBRUARY 25, 2021
```

**Date**     **Proceeding**                                    **Page**


**2/25/21**  **Motion for TRO/Preliminary Injunction**
         Argument by Mr. Dates...........................  9
         Argument by Mr. Gerber......................... 15
         Argument by Mr. Dates......................... 19
         Argument by Mr. Gerber......................... 21
         Court comments and ruling...................... 23

P R O C E E D I N G S

February 25, 2021

THE CLERK:  The Court will now hear Civil Case 21-83,
Kibble & Prentice Holding Company vs. Lee Tilleman, regarding a
motion for temporary restraining order and preliminary
injunction and a motion for expedited discovery.

THE COURT:  Good morning, Counsel.

Counsel, let me begin with a couple things by way of
housekeeping.  I've got a sentencing in one hour, so I can't let
this hearing go on for terribly long.  I could really only give
you 15, maybe 20 minutes per side, tops -- probably 15, because
I'm going to take some time now and lay out my thinking about
the case.

I do this in every case.  I don't want you to think
that I have prejudged the case or anything like that, but I
think it is almost always helpful to let counsel know what I'm
thinking.

I have reviewed the briefs.  I didn't get a chance to
read everything I would like to have read; but, again, this
comes before me on very short notice, so we haven't had time to
quite get fully up to speed.

Now, let me explain -- so let me go through and lay
out my thinking.  If I would have had time, I would have drafted
a decision, sent it out in advance, and -- as a kind of a
preliminary and given you a chance to respond to it in writing.

1    This is really kind of a verbal equivalent of that.

2         So here goes:  First of all, there is two -- well,

3    three things the Court has to take up.  One is a request for an

4    injunction to prevent Mr. Tilleman from providing any services

5    to Alliant or advertising their relationship for 60 days because

6    of the alleged breach of the notice requirement.

7         I will be candid:  I think that one is a -- in fact,

8    my notes here that I made to myself is that it seems to me

9    that's almost a nonstarter.

10        Mr. Tilleman -- I think, clearly, the contract does

11   include a 60-day notice requirement, and it cuts both ways.

12   Both Mr. Tilleman and USI are obligated to not terminate the

13   contract without giving that notice.

14        And plaintiff, I think, can clearly recover -- that

15   is, USI can clearly recover any damages they suffered as a

16   result of not being given that notice.

17        But it is not a noncompete clause.  And I think to say

18   that, because you failed to give notice, therefore, you can't

19   work for anyone else for 60 days, I don't think that's really

20   what the contract says or what it requires.  And I think,

21   frankly, you would almost run into a 13th Amendment issue.

22        You just can't -- you just can't compel somebody not

23   to work or go to work for someone else unless that is expressly

24   contracted for in some fashion by way of a noncompete.

25        So I think that one, plaintiffs got a real uphill

1    battle on that.

2          The second request is an injunction to prevent

3    Mr. Tilleman from soliciting -- I should say prevent

4    Mr. Tilleman or anyone working in concert with him from

5    soliciting, accepting, or servicing any USI client accounts or

6    those clients who were being developed or solicited at the time

7    of the termination.

8          Now, there's two prongs that I think need to be

9    addressed.  The first, of course, is likelihood of success on

10   the merits.  And I think the plaintiffs clearly have satisfied

11   that.

12         I have thought a lot about this last night, frankly,

13   even in the middle of the night; as I woke up.  I often do that

14   thinking of the morning's hearings.

15         What struck me is this is not your classic covenant

16   not to compete.  It's more of an anti-piracy provision.  A

17   covenant not to compete, as counsel has pointed out, is

18   generally frowned upon and construed narrowly against the

19   employer.  It is basically a covenant not to take customers with

20   you.

21         So Mr. Tilleman is free to work for another agency,

22   free to continue practicing his craft as an insurance agent.

23   But what he can't do is pirate the customers that he developed

24   under USI and its predecessors.

25         I think the *JUB Engineers* case from the Idaho Supreme

1    Court I thought was really instructive.  And what that decision

2    indicates is that some courts make a broad, categorical

3    distinction between those two type of cases: your classic

4    noncompete and the anti-piracy provisions.

5         Justice Si- -- or no.  Justice Trout in that case

6    opted not to break that down but said, basically, we look at

7    what does an employer -- what reasonable interest does an

8    employer have to protect, and is the provision reasonably tied

9    to the need to protect that employer's interests.

10        And frankly, given the fact that it is just an

11   anti-piracy provision, I think we almost start off with an

12   assumption that it is reasonable.  And I think two years for

13   existing clients and six months for clients currently being

14   solicited does not seem inordinately long and would, therefore,

15   not run afoul of the reasonableness requirement in terms of its

16   duration.

17        So I think, in my view, just reading the briefing,

18   reading the contract, I think the plaintiffs clearly have met

19   the burden of showing a likelihood of success on the merits.

20   But I think the problem is irreparable injury.

21        Simply put, if the plaintiff solicits or services USI

22   customers, that is easily determined.  You can simply compare

23   who they were servicing before -- who Mr. Tilleman was servicing

24   before he left USI and who he is servicing now.  And for two

25   years, he will have to disgorge whatever the lost premiums were

1    that USI will have lost as a result of that.  The simplicity of

2    that calculation, I think, belies any suggestion that there is

3    irreparable injury.

4         Now, I am aware that there was the contractual

5    agreement in which Mr. Tilleman agreed that USI would suffer

6    irreparable injury if the covenant is breached.  But, frankly, I

7    think those provisions are not particularly compelling; and the

8    case law is clear that, while that is something of an admission

9    by the employee, that irreparable injury will occur.

10        The case law is clear -- and in fact, I saw a

11   Ninth Circuit case in which they reversed the district court for

12   relying upon that solely as a grounds for irreparable injury and

13   indicated that the court must make its own separate, independent

14   findings of irreparable injury before injunctive relief can be

15   granted.

16        And then, finally, again, just my notes from my review

17   last night, this is not a goodwill case where you have got

18   either the sale of a business or where there is this intangible

19   notion that the plaintiff is going to lose goodwill.  It's

20   simply a loss of customers.  And those customers can be

21   calculated; that is, a loss associated with the loss of those

22   customers can be calculated.

23        Now, Counsel, that's my preliminary thoughts on the

24   matter.  You, of course, are -- and I want to say that I do keep

25   an open mind.  There may be something that I completely missed

1    here, and I want you to point that out in making your argument.

2          So I think the plaintiff, USI -- who is going to argue

3    for them?

4          MR. DATES:  I am, Your Honor.  Thank you very much for

5    your analysis and thoughtfulness.  We really appreciate it.

6          I will focus right in on the issue that Your Honor

7    laid out with respect to the Court's concerns relating to USI's

8    motion for TRO, and that is the issue of irreparable harm.

9          As Your Honor pointed out, so I won't spend a lot of

10   time on it, Section 10 includes an agreement that should

11   Section 8 be breached, there would be irreparable harm.

12          But beyond that, I think -- and it is USI's

13   position -- that this is an issue related to goodwill for many

14   reasons.

15          The insurance brokerage business is a people business.

16   It is highly reliant on producers and sales agents.  And when

17   customers leave in droves -- we've already have had ten

18   customers indicating that they are leaving -- that presents a

19   big hit to USI, specifically in a region like this in the

20   Northwest region, where USI has a smaller base.

21          The reputation hits, the goodwill hits matter a lot.

22   And those are not easily calculated.

23          So, Your Honor, USI's position is that this is -- this

24   is very much an issue related to goodwill.

25          THE COURT:  Well, Mr. Dates, isn't the goodwill -- you

1    know, I know in dealing with my own insurance agent, my

2    relationship is really more with the agent than it is with the

3    company.

4            And -- and if a -- how is the goodwill going to suffer

5    if the customer is simply exposed to Alliant, and -- and why

6    can't that just be calculated for a period of two years?  Why

7    can't you just say:  Okay.  There are -- they had 100 customers

8    that USI had serviced by Mr. Tilleman.  Those transferred over.

9    He now has to pay damages equal to the lost premium for that

10   period of time?

11           What more is there by way of goodwill that would

12   actually be a loss suffered by USI?

13           MR. DATES:  Thank you, Your Honor.

14           I'll point to two things:  One, the nature of the

15   response brief and the arguments in the brief that suggest that

16   USI has made all of these changes; USI is a terrible company;

17   USI, you know, is bad for business with respect to insurers.

18   That goes part and parcel with this argument.

19           Your Honor, we also referenced in an affidavit a

20   voicemail which we didn't -- I didn't know how to include it as

21   an audio file in the filing.  I'm going to have to figure out

22   that one day.  And we didn't include a transcript because it

23   would have just been me transcribing the voicemail.

24           But basically, it's a customer of Lee, saying:  Hey, I

25   understand that there have been some changes at USI.  USI has

1    been good to me, but this is a -- this is a people business.  I

2    understand that there have been some changes at USI.

3           And it's really sort of the inference related to those

4    sorts of changes that, frankly, we believe are being spread by

5    Tilleman and the other USI employees who are departing at the

6    same time.  It will have a substantial impact on USI's

7    reputation, particularly within that -- within that -- within

8    that market.

9           THE COURT:  Okay.  All right.  Thank you.

10          Go ahead.  I just -- you answered my question.

11          MR. DATES:  Sure.  Your Honor, and then with respect

12   to damages, it's not just the -- a straight calculation of

13   what -- what USI lost with respect to commissions pertaining to

14   Lee Tilleman.

15          But one of the -- one of the real benefits of having

16   producers and the reason why they make so much money is -- is

17   because you not only get the producer; you get an opportunity to

18   expand the relationships, multiply the relationships over the

19   years.  You get referral sources over time.  So it's not as easy

20   to calculate as it may seem on its face.

21          For those reasons, Your Honor, we do believe that

22   there is irreparable harm.  And to be clear, if the Court is

23   balancing the equities between the harm that USI will suffer and

24   the harm that Tilleman suffered, Tilleman is already saying:

25   I'm not soliciting; I'm not accepting.

1          So we view it as there being virtually no harm to

2     Mr. Tilleman to basically have a court order that reinforces

3     what Mr. Tilleman says he is already doing.  We, of course,

4     don't believe that to be the case.  But if that's their

5     position, we think the balances of irreparable harm certainly

6     fall in favor of USI.

7               THE COURT:  All right.  Okay.

8          What about -- the one thing I did not mention was

9     expedited discovery.  Why is there a need for that?

10              MR. DATES:  Your Honor, so there is a pattern here.

11    And I'm not sure if -- I didn't really spell out all of it in

12    detail, but this isn't the first time that -- that USI has had a

13    run-in with Alliant or that Alliant has had a run-in with other

14    companies.  There is a very familiar pattern here.

15         We get, you know, several resignations at one time,

16    which is what happened here.  We had Tilleman, we had somebody

17    else in Idaho, we had somebody else in Minnesota, I think we had

18    somebody else in another state all resign at the same time.

19    Quickly thereafter, we began to lose client after client after

20    client after client.

21         So this is really an effort to do two things:  One is

22    to stop that bleeding and also to get into many of the details

23    that -- that Alliant or Mr. Tilleman talked about in their

24    brief.

25              For example, we hear it a lot, going back to the

1    statement:  We are not soliciting.  We're not -- well, you know,

2    we -- we don't think that that's the case.  And we would like

3    expedited discovery to be able to show the Court with additional

4    evidence that there has, in fact, been solicitations.  And not

5    only that, that this is a concerted effort to move USI's

6    business in that area over to Alliant.

7            THE COURT:  Okay.  One thing I was struck by was the

8    lack of specific cases dealing with this -- cited by either side

9    dealing with this precise situation.

10           In fact, it's not at all unusual where the insurance

11   companies keep tabs on what decisions are coming down in

12   reviewing the language in their employment agreement with

13   agents.  And often those are cited back to me where a court

14   either did or did not find irreparable injury, either did or did

15   not issue a TRO.

16           What -- are there any such cases?  I mean, do you have

17   a case where -- you mentioned that there are other -- these

18   things come in waves.  Do you have a lawsuit where the very same

19   thing happened here, and you were able to obtain an injunction?

20           MR. DATES:  Your Honor, I believe we do.  If

21   Your Honor would like, I could submit a supplemental response to

22   the Court.

23           I'm pulling up my spreadsheet now.  I'm trying to pull

24   it up with respect to the litigation involving Alliant.  But,

25   Your Honor, we would be happy to submit something supplemental

1      related to what other courts have done.

2            THE COURT:  All right.  Well, I would have thought you

3      would have cited that in the original brief filed, if you had

4      something that was kind of -- I mean, that's typically what I

5      would see.

6            You know, we get these more probably with -- well, I

7      think now we don't even get them with stockbrokers because -- or

8      financial advisors because those are all going into arbitration,

9      and we just don't see them in federal court much anymore.

10            But this is not just that uncommon, and that's why I

11     thought there would be more case law.  But I really didn't see a

12     whole lot of case law cited on either side that was really

13     square on point with what we're dealing with here.

14           You know, let me give it some thought.  I may invite

15     some more briefing, but I do -- I'll give it some more thought.

16           Anything else you wanted to add?

17           MR. DATES:  No, Your Honor.  I don't want to be

18     disrespectful and type on my computer, but I want to try to find

19     something for you.

20           THE COURT:  Well, why don't you reserve a few minutes

21     for rebuttal.

22           MR. DATES:  Okay.  All right.  Thank you, Your Honor.

23           THE COURT:  Now, Mr. Gerber, are you going to argue?

24           MR. GERBER:  Yes, Your Honor.

25           THE COURT:  All right.  Mr. Gerber.

1          MR. GERBER:  First of all, thank you, Your Honor, for

2     allowing me to practice in your court.  I appreciate it very

3     much.

4          I would like to address two points on your tentative

5     based on your discussion.  I would like to start with the notion

6     of irreparable harm and then move on to the question of

7     likelihood success on the merits.

8          But starting with irreparable harm, Your Honor, USI

9     has not met its burden here to demonstrate that the issuance of

10     a temporary restraining order is necessary to prevent immediate

11     and irreparable harm.

12          USI's allegations of irreparable harm are based solely

13     on speculation.  And as you correctly note, this is a case

14     involving lost customers.  USI can easily calculate the lost

15     revenue.  They track the annual commissions from these policies.

16     They know what their profit margin is.  They know what their

17     retention rate is.  And they are certainly capable, as a

18     $2 billion corporation, of hiring damages experts that can

19     perform discounted cash flow and market-based analysis to

20     compute damages.

21          Even goodwill can be factored into that analysis

22     through a market-based approach, because in this industry, it's

23     not uncommon for one insurance brokerage firm to purchase the

24     book of business of a producer that comes over.

25          And so, based on that transactional history, they can

1    value what a book of business or lost customers are both from a

2    market-based approach and -- and a discounted cash-flow

3    analysis.

4            So it's easily calculable.  And we have cited in our

5    brief, I believe it's a case from the District Court in

6    Minnesota, the *Wells Fargo vs. King* decision from 2016, wherein

7    an insurance broker went to work for a competitor.  And the

8    court held that this is a case about money, and lost profits are

9    repairable through money damages.  And I think that decision is

10   directly on point.

11           Your Honor has asked about other decisions involving

12   USI.  There was a decision involving Vanessa Anderson yesterday.

13   You heard counsel, Mr. Dates, mention that Mr. Tilleman and some

14   unnamed other person left.  The unnamed other person is Vanessa

15   Anderson.  And yesterday the court in which they sued her denied

16   USI's request for a temporary restraining order because it had

17   not satisfied its burden to show irreparable harm.

18           THE COURT:  Which judge -- which judge was that in

19   front of?

20           MR. GERBER:  I can pull up the order and tell you.  I

21   believe it was -- let me pull it up for you, Your Honor, and

22   I'll give you that answer.

23           It was Judge -- sorry.  My computer is acting a little

24   funny.

25           THE COURT:  That's all right.

1          MR. GERBER:  Here we go.  It was Judge Juanita

2     Freeman, the judge in the district court yesterday.

3          THE COURT:  All right.  And which district?

4          MR. GERBER:  That was State -- State of Minnesota,

5     County of Washington, 10th Judicial District.

6          THE COURT:  Okay.  So it's not federal.  I'm sorry.  I

7     thought it was filed -- go ahead.

8          MR. GERBER:  So that decision just came down

9     yesterday, Your Honor, which they say, you know, this was

10    related to Vanessa Anderson.  The judge struck down their effort

11    to obtain a TRO on this exact ground, on irreparable harm.

12         In this industry, they have the ability, as the

13    incumbent brokerage firm, to communicate with any client that

14    makes a decision to leave.  They have, by industry custom, an

15    eight- to ten-day window of time to call or meet with those

16    customers and attempt to obtain what they call a letter of

17    recission, to cancel the broker of record letter to transfer the

18    account.

19         And then even after a client leaves, they are always

20    free to compete for that business, including at the time that

21    the annual policy renews.

22         So this notion that clients are lost forever and they

23    are just going to throw up their hands and not try and recapture

24    the business is pure fiction.  These insurance brokerage

25    firms -- and USI is one of the largest in the world, with

1    thousands of employees and 2 billion in revenue -- will continue

2    to make efforts to recapture this business.

3              And if the client wants to go back, the client is

4    always free to go back if the client decides that's what's in

5    their best interest.  If the clients don't go back, it's for a

6    reason.  And the reason is exactly what Your Honor put your

7    finger on, which is that, in this industry, it is a relationship

8    with the producer that the clients have a connection with.  And

9    I believe Mr. Dates said it's a people business, and that's very

10   true.

11             And so when a broker leaves to go from one firm to

12   another and that long-term personal friend/trusted advisor

13   leaves, then it's not uncommon for clients to not stay at the

14   former brokerage firm.

15             They look at their options.  They may follow the

16   broker, whether they're solicited or not.  They may go to a

17   third-party broker.  But they don't necessarily all just stay.

18             And we're in a situation here -- and this dovetails

19   into likelihood of success -- where there is absolutely no

20   evidence before Your Honor showing that Mr. Tilleman, who is a

21   well-respected member of the community -- a volunteer fireman;

22   he's a coach; everybody knows him in the community; he is very

23   well respected -- he left.  And simply because he left, they

24   leap and make this astronomical leap that he must be engaging in

25   all these breaches with absolutely no evidence that he has

1    solicited any clients, that he personally accepted business from

2    any of these clients, or that he is servicing any of their

3    accounts.

4              They're -- they come before your court and argue

5    simply because they have these covenants, they should get an

6    injunction.  But that's not sufficient.  Whether the clause is

7    reasonable or not, they have to show a likelihood of success.

8    And they have no evidence that Mr. Tilleman is in breach of

9    that -- of that restrictive covenant.  Whether it's reasonable

10   or not, they still need to show that he's breaching.

11             And simply because clients have chosen to leave after

12   he left, that, in and of itself, is insufficient to show

13   wrongdoing.  And to the extent -- even if they did make that

14   showing -- and there's no evidence in the record to support

15   their -- their speculation, this complaint that's just rampant

16   speculation and assumption, they -- they cannot show irreparable

17   harm, because money damages in these type of situations are more

18   than adequate, as the court in Minnesota just found yesterday in

19   the companion case.

20             And unless Your Honor is inclined to change your

21   tentative, I'm happy to answer any questions you may have.

22             THE COURT:  Okay.  All right.  That's fine.  Thank

23   you.

24             Mr. Dates.

25             MR. DATES:  Yes.  Thank you, Your Honor.  A few

1     things.

2          One, in addition to the state case, we also have

3     another federal court -- another federal case that we argue -- I

4     think we argued it on -- yesterday, Seth -- you know, my days

5     are running together -- in the District of Oregon before Judge

6     Hernandez.  And we expect to get a ruling on that any moment

7     now, so there will be a federal court decision on that.

8          Your Honor, we also, in our motion -- I think it's on

9     page 18, the last page of the brief -- in the block quote, cite

10    two cases versus Alliant wherein the court had granted motions

11    for temporary restraining orders.

12          Finally, Your Honor, we -- going back to a few of the

13    points that were made with respect to Seth -- Mr. Gerber --

14          I'm sorry; I didn't mean to call you "Seth."

15          -- Mr. Gerber, you know, there's a lot that's not

16    being said here, and I just want to say it out loud because I

17    think it will help guide -- guide the Court in terms of what's

18    happening here.

19          So, you know, Mr. Gerber has said, on one hand, it is

20    a people business.  You know, people follow insurers because of

21    these deep ties and personal relationships.

22          On the other hand, nobody followed Mr. Tilleman over

23    to Alliant, all ten of these clients.  They just think that

24    Alliant is this wonderful company, and -- and Mr. Tilleman will

25    not -- will not -- has not solicited those clients, hasn't said

1      anything about whether he's going to accept those clients.

2              And furthermore, there is one important question that

3      hasn't been answered at all, which is:  What financial revenue

4      is Mr. Tilleman receiving as a result of these clients moving if

5      he's so detached from these clients moving to -- to -- to

6      Alliant?

7              And, Your Honor, this goes back to our request for

8      expedited discovery.  We think that sort of the shell game being

9      played here will be revealed quite clearly with a few document

10     requests and -- and a deposition.  And so, Your Honor, we think

11     that they're -- they are related.

12             And going back to the irreparable harm issue, which I

13     know Your Honor pointed out earlier, we think that, you know,

14     what Mr. Gerber says supports our view that this is -- this is,

15     in fact, irreparable, beyond what can be calculated.  Because

16     USI is receiving hits to its reputation; it is receiving hits to

17     its goodwill.

18             MR. GERBER:  May I respond very briefly, Your Honor?

19             THE COURT:  Very briefly.  Go ahead.

20             MR. GERBER:  There is absolutely no evidence that

21     Mr. Tilleman is going around and telling clients negative things

22     about USI.  That's pure speculation and assumption.

23             I don't think you'll find a single declaration from

24     any client that is still at USI or anybody else indicating

25     Mr. Tilleman is engaging in any such conduct.

1          As far as other lawsuits, USI has been involved in

2     lawsuits.  All major insurance brokers with thousands of

3     employees in -- in a mobile workforce are involved in litigation

4     from time to time.

5          And so I think, you know, we are here before you on

6     these particular facts and on this particular record.  And

7     what's evident from this record is an absence of any evidence of

8     wrongdoing by Mr. Tilleman.  He is a very respected individual

9     in his community.

10          They have no evidence from the clients that made

11     decisions to leave or the clients that stayed that he has gone

12     out and said anything to solicit them, to -- he has not accepted

13     their business, and he is not servicing their accounts.

14          And so, presumably, they could come forward if he was

15     out canvassing his clients to try and get them to move with one

16     declaration from someone saying that he either solicited them or

17     that he said something negative.

18          And they have not brought forth that evidence because

19     it doesn't exist because he is not doing it.

20          THE COURT:  All right.  Well, Counsel -- Mr. Dates,

21     any last -- I generally want the moving party to have the last

22     word.  So is there any last words?

23          MR. DATES:  Not from me, Your Honor.  I don't know if

24     my co-counsel would like to add anything.

25          MR. ASHBY:  No.  Just appreciation, Your Honor, for

1      accommodating us with your schedule.  We realize this is short

2      notice, and we appreciate the Court reviewing the materials and

3      being prepared.  So thank you.

4              MR. DATES:  Thank you, Your Honor.

5              THE COURT:  Thank you.

6              Well, Counsel, it struck me -- I -- generally, I try

7      to rule from the bench whenever I can.  And I do that for two

8      reasons, one of which applies here, one of which will not.  And

9      let me explain.

10             The reason I rule from the bench, particularly on a

11     TRO, is:  Generally, the parties need an answer, and they need

12     it quick.  And if I take the time to write, you know, the *War*

13     *and Peace* or a tome on this, it doesn't really help anyone, and

14     it's going to take me weeks to get a decision out.

15             The second reason is:  It's easier on my staff.  We

16     don't -- if we don't have to write a long decision and just rely

17     on what I announce, then it's easier on the staff.

18             I'm not going to achieve that in this case because I

19     think I feel the need to write something because of these cases

20     that are popping up, and it's basically for the -- for the good

21     of the judiciary that when we have cases that are being pursued

22     and we see a number of them, it generally is helpful if judges

23     do articulate their reasoning.

24             So we will issue a short decision, but it's going to

25     be very short.  It won't say much more than what I've already

1          said here.

2                  I'm going to deny the requested relief.  I -- as I've

3          noted, I think that if, indeed, Mr. Tilleman is servicing or

4          soliciting any of the clients that he developed while working

5          for USI, it seems clear to me that's going to be a breach of

6          that agreement.

7                  And as I noted, at least from my point of view, it

8          does not seem to be at all an unreasonable anti-piracy

9          provision.  It's something that we see all the time, and it's

10         what companies need to do to protect themselves when they spend

11         money paying, well, substantial sums to their agents.

12                 And in this case, I guess there was perhaps several

13         hundred thousand dollars paid in some kind of a solicitation to

14         keep Mr. Tilleman on board.  The quid pro quo for that is:  You

15         don't walk away; and if you do walk away, then you don't take

16         our clients with you.

17                 So I think that's reasonable.

18                 But I think, again, the problem is irreparable injury.

19         You know, goodwill may be at issue in this case, but I think

20         it's a fairly minor matter; I think particularly in the

21         insurance industry, where so much of the goodwill really goes to

22         the agent and how the agent develops that relationship with

23         their clients.

24                 And as was suggested by Mr. Gerber, goodwill typically

25         is calculated.  There are people who do nothing but value that

1          in terms of transactions.

2                  So, for those reasons, I'm going to deny the requested

3          relief.  I think the need for expedited discovery, that one is a

4          little closer.  I'm -- I'm going to look at that.  And when we

5          write the decision, I may spend a page or two going over that.

6                  My inclination now, though, is not to expedite

7          discovery.  Because I don't see that there's any urgency here

8          because I've decided that there really is no grounds for the TRO

9          being issued.

10                 So, Counsel, we will issue a written decision.  I hope

11         to have that out sometime next week.  It will be very short, but

12         it will say basically what I've said here today.

13                 And I want counsel to understand:  It is not that I

14         thought Mr. Dates or Mr. Ashby didn't do a good job presenting

15         their case.  They did a great job.  The briefing was submitted;

16         it was well thought out, it was well argued.  But you have to

17         deal, you know, with the facts and the law.

18                 And at the end of the day, I just, in this case, feel

19         that although I think there is a likelihood of succeeding on the

20         merits if, indeed, Mr. Tilleman is soliciting or servicing any

21         of his -- any of the customers and clients that he developed

22         while working for USI, there will be liability, but we can deal

23         with that by way of damages.  And therefore, there is no need to

24         issue a TRO because there is just no irreparable injury.

25                 So that will be the basis of the Court's decision, but

1    I will write something.  Judge -- is it Judge Hernandez, I think

2    you said, in the District of Oregon -- you know, it could be

3    he'll look at it differently.  But at least we'll then have a

4    body of law developed so when other judges are looking for this,

5    they'll be able to find something more than what I have orally

6    pronounced.

7         So we will issue a short written decision, hope to

8    have it out fairly quickly.  But I will deny the requested

9    relief.

10        All right.  Is there anything else, Counsel?  From the

11   plaintiffs, Mr. Dates, Mr. Ashby?

12        MR. DATES:  I don't think so, Your Honor.  Not from

13   our end right now.

14        THE COURT:  All right.  Mr. Gerber, anything from the

15   defense?

16        MR. GERBER:  No.  Thank you, Your Honor.

17        THE COURT:  All right.  All right.  If there is

18   nothing else, then, Counsel, I do have a sentencing shortly.  So

19   I'll be in recess.

20        And, Ms. Gearhart, you may terminate the video

21   connection.

22        MR. DATES:  Thank you for your time, Your Honor.

23        THE COURT:  Thank you.

24        (Proceedings concluded at 9:35 a.m.)

25

1                              REPORTER'S CERTIFICATE

2

3

4              I, TAMARA I. HOHENLEITNER, CSR, RPR, CRR, certify that

5       the foregoing is a correct transcript of proceedings in the

6       above-entitled matter.

7

8

9

10

11

12

13

14      /s/   Tamara I. Hohenleitner              03/12/2021
        _____          _____
15      TAMARA I. HOHENLEITNER, CSR, RPR, CRR     Date

16

17

18

19

20

21

22

23

24

25