UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KIBBLE & PRENTICE HOLDING COMPANY, d/b/a USI INSURANCE SERVICES NORTHWEST,<br><br>　　　Plaintiff,<br><br>　　v.<br><br>LEE TILLEMAN, and ALLIANT INSURANCE SERVICES, INC.,<br><br>　　　Defendant. | Case No. 3:21-cv-00083-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff Kibble & Prentice Holding Company d/b/a USI Insurance Services Northwest ("USI") brought this action against its former employee, Lee Tilleman, and Tilleman's new employer, Alliant Insurance Services, Inc., a direct competitor of USI. USI alleges claims for breach of contract and breach of fiduciary duty against Tilleman and a claim for tortiuous interference with contract against Alliant. The Court previously denied USI's motion for a preliminary injunction, seeking to enjoin Tilleman from competing with USI by servicing any of his

former clients on behalf of his new employer based on a finding that USI had failed to show irreparable harm.

The Court now has before it the parties' cross-motions for summary judgment. The Court heard oral argument on September 12, 2022, and now the matter is ripe for disposition. For the reasons set forth below, the Court will deny Tilleman's motion for summary judgment and grant in part and deny in part USI's motion for summary judgment.

## BACKGROUND

USI and Alliant are competitors in the commercial agriculture insurance brokerage industry. Insurance brokerage firms rely on client relationships and goodwill generated and nurtured by agents, also known as "producers," to attract and retain clients.

In 1994, Tilleman began working as a producer for CHS Insurance Services, a specialty brokerage form, primarily working out of his home in Genesee, Idaho. Over the 30 years at CHS, Tilleman provided brokerage services for and developed relationships with many clients in the Northwest. In May 2018, USI Insurance Services, LLC[1] acquired the assets of CHS's agriculture insurance business. At

---

[1] USI Insurance Services LLC purchased the membership interests, customer accounts, and associated goodwill of CHS for approximately $60 million. *Dates Decl.* ¶ 9, Dkt. 2-2. (Continued)

that time, USI required its "legacy producers" to sign employment agreements

containing restrictive covenants. If Tilleman wanted to continue his employment

with USI, Tillman had to sign such an employment agreement, which contains the

restrictive covenants at issue in this case. The restrictive covenants include

provisions that applied during Tilleman's employment, as well as post-

employment covenants.

Section 8.5 is headed "Non-Solicitation of Clients and Active Prospective

Clients." Section 8.5(a) prohibits a "Producer" for a period of two years after

ending their employment with USI from "directly or indirectly" soliciting or

attempting to solicit insurance business from any of USI's clients:

> (a) During the Term and for two (2) years after Producer is no longer
> employed hereunder, for any reason, Producer shall not, without the
> Company's prior written consent, directly or indirectly, on behalf of any
> Competitive Business in any capacity: (i) solicit or attempt to solicit
> services in competition with the Company to any Client Account; (ii)
> divert or attempt to divert services away from the Company with
> respect to any Client Account; (iii) consult for any Client Account with
> respect to services in competition with the Company; (iv) sign a broker
> of record letter with any Client Account to provide services in
> competition with the Company; or (v) induce the termination,
> cancellation or non-renewal of any Client Account; in each case with
> respect to any Client Account that Producer managed or regularly
> serviced and/or about which Producer obtained Confidential

---

Plaintiff Kibble & Prentice Holding Company d/b/a USI Insurance Services Northwest is a
wholly owned subsidiary of USI Insurance through which it services clients in the northwest
United States. For ease of reference, USI Insurance and USI Insurance Services Northwest are
collectively referred to as USI.

Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

Section 8.5(b), in turn, prohibits the solicitation of any "Active Prospective Client" of USI:

> (b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, without the Company's prior written consent, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

Section 8.6, also at issue here, is headed "Non-Acceptance/Non-Service of Clients and Active Prospective Clients." Section 8.6(a) prohibits the Producer from "directly or indirectly" accepting or servicing any of USI's clients at a competitor business:

> (a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Client Account; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Client Account; in each case with respect to any Client Account that Producer managed or regularly

serviced and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last two (2) years of Producer's employment hereunder.

And Section 8.6(b) further prohibits a former Producer from "directly or indirectly" accepting or servicing any "Active Prospective Client" of USI:

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) sell, provide, or accept any request to provide services in competition with the Company to any Active Prospective Client; or (ii) sign or accept a broker of record letter to provide services in competition with the Company to any Active Prospective Client; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company or any Predecessor within the last six (6) months of Producer's employment hereunder.

*Agreement* §§ 8.5, 8.6.

In addition to the post-employment covenants, the employment agreement contained covenants that applied during Tilleman's employment:

******

**2.4 Duty of Loyalty**. Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently, and completely perform all duties and responsibilities hereunder in furtherance of the business of the Company and any other USI Company.

******

**8.2 Confidentiality During and Following Term**. During the Term and for five (5) years after Producer1 is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential

Information of the Company, any Predecessor or any USI Company except: (a) in the normal course of business on behalf of any USI Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure). …

Tilleman signed the employment agreement. As consideration for entering into the employment agreement containing the restrictive covenants, USI provided Tilleman separate and additional compensation to which he was not otherwise entitled in the form of a Retention Payment and Acquisition Bonus. Although Tilleman executed the agreement as required to continue working for USI, soon after USI's acquisition closed, Tilleman began to question his decision to continue his employment as a producer under the USI banner. USI began to immediately change their service model and how interaction would occur between clients and producers – and, in Tilleman's estimation, not for the better.

First, USI management told Tilleman that he should devote 80 percent of his time to finding new business, and only 20 percent of his time servicing existing clients. Tilleman did not believe he could limit himself to spending only 20 percent of his time servicing his existing clients and continue to keep them happy. Tilleman also objected to USI's directive that he make cold calls to develop new business because Tilleman did not believe that approach works well in the agribusiness space. In Tilleman's experience, farmers and others working in

agribusiness prefer personal contact with their brokers. Tilleman had developed his book of business by relying on his own expertise and his skill at fostering relationships – and he would never seek business from a prospective client until he had built a relationship with the prospects, which Tilleman perceives as "completely different than USI's method of telemarketing by phone." *6.14.21 Tilleman Dep.*, 25:11-26:4, Dkt. 64-4.

Second, USI gave account managers, rather than producers, responsibility for handling existing accounts, even though they did not possess the same level of training as legacy producers like Tilleman. USI also fired the Safety Resource team from CHS, on which clients had relied to improve their safety programs; USI changed its claims reporting process so clients had to self-report claims to carriers instead of benefiting from the claims-handling experience and expertise of producers; USI broke apart its agribusiness vertical into separate regions and assigned Tilleman to its Northwest Region, even though Tilleman had many prospects in the Mountain Region; and USI's accounting department made numerous mistakes, including by sending past due statements to clients when the clients had already made the required payments.

Tilleman maintains that these issues not only upset him but also led to complaints from clients, which made him fear he would lose clients: "if those changes were going to continue to happen and they were going to continue to

remove the broker from the servicing of the client, the clients were going to leave. They were going to go somewhere else." *6.14.21 Tilleman Dep.* 32:8-20, Dkt. 64-4. Tilleman further testified that USI was "really upsetting our clients with the changes that they had made," and that "several clients" told him "that the only reason they are staying at USI was because of me." *Id.* 29:21-31:12; 31-13-25. In fact, according to Tilleman, clients volunteered to him they would happily follow Tilleman to another firm should he ever decide to leave USI. Tilleman felt that USI had shackled his ability to service his clients in the manner he wanted to and how he had done in the past. This led to Tilleman's decision to consider leaving USI.

Prior to making any decision to resign from USI, Tilleman consulted with two friends of 20 years – Chris Peha of Northwest Grain Growers and Heath Barnes of Mercer Landmark. Northwest Grain Growers and Mercer Landmark were among Tilleman's top clients. Tilleman maintains that he only expressed his frustrations with USI and his thoughts about leaving after both Peha and Barnes raised their own concerns about USI to him. Tilleman asked Peha whether he thought going to Alliant would be a good move for Tilleman, and in an email chain with Peha, Tilleman stated that he "would greatly appreciate" Peha's support should Tilleman move to Alliant, and Peha responded, "We are on board with the move." *Dates Decl.* Ex. 78 at 2, Dkt. 65-80. Tilleman also confided in Barnes about potentially leaving USI when Barnes complained to him about USI's

"incredibly" poor service. Barnes later moved Mercer Landmark's business to Alliant, but Barnes testified his decision to move his business had nothing to do with his conversation with Tilleman. *Barnes Dep.* 55:12-18, Dkt. 64-5.

The pandemic temporarily quieted Tilleman's conversations with Alliant in late 2020; in early January 2021, however, their talks picked up again, and Tilleman accepted an offer from Alliant. Tilleman testified Alliant's culture prompted his decision to move there. On February 3, 2021, Tilleman resigned from USI effective immediately and the next day started working for Alliant. Before Tilleman started at Alliant, Alliant had instructed him not to take any USI confidential information and Tilleman returned to USI all USI property, including his USI-issued devices and work papers. As part of its onboarding of Tilleman, Alliant arranged for forensic examination of Tilleman's personal devices and electronic accounts to ensure they did not contain USI files.

Tilleman did not tell any clients – other than his two conversations with Barnes and Peha in mid-2020 – that he might be leaving USI or that he was talking to Alliant. Tilleman did not inform any clients he had resigned from USI. Some reached out to Tilleman, but Alliant had instructed Tilleman not to initiate contact with any clients and, if clients contacted him and asked him about Alliant, to refer them to Alliant's Trey Busch or Bruce Droz. Tilleman testified that when former clients contacted him at Alliant, he would "get off the phone as quickly as possible

and not really have a conversation" of substance about business and would merely refer them to Busch or Droz. *5.16.22 Tilleman Dep.* 182:18-183:16, Dkt. 64-4.

Even Tilleman's close friend, Barnes, only learned about Tilleman's official departure from USI for Alliant from Tilleman's LinkedIn profile, which Tilleman had immediately changed. Barnes contacted Tilleman after learning he had left UIS and joined Alliant. In this conversation, Tilleman only briefly explained to Barnes that her was no longer with USI and that "he wasn't at liberty to discuss details." After Barnes told Tilleman he "wasn't staying at USI" and asked about Alliant, Tilleman gave Barnes a contact number at Alliant. *Barnes Dep.* 32:21-33:24, Dkt. 64-5. Tilleman gave a similar response to another former USI client, Kevin Adams at Pendleton Grain Grower, who had contacted Tilleman "because of the poor service they were receiving from USI," explaining to Adams that he could contact Droz or Busch if he wanted to leave USI, but Tilleman could not help him. *5.16.22 Tilleman Dep.* 182:18-183:16, Dkt. 64-4.

Several former USI clients called Droz or Busch at Alliant after they spoke with Tilleman, but neither Droz nor Busch ever initiated contact with these clients. *5.10.22 Busch 30(b)(6) Dep*. 89:10-18, Dkt. 64-4. Many of these former USI clients transferred their accounts to Alliant, some of whom specifically transferred their business so that they could eventually work with Tilleman. Since Tilleman joined Alliant, 29 of his former USI clients transferred their business to Alliant.

Tilleman did not solicit or directly receive the "broker of record" letters from these clients that officially made Alliant their insurance broker. None of the clients who transferred their business from USI to Alliant during this time reported that Tilleman or Alliant had contacted them first or that Tilleman participated in transferring their business to Alliant.

## LEGAL STANDARD

One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . .." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool [] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (19860>

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is

not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). When cross-motions for summary judgment are filed, the Court must independently search the record for issues of fact. *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). The filing of cross-motions for summary judgment – where both parties essentially assert that there are no issues of material fact – does not vitiate the court's responsibility to determine whether disputed issues of material fact are present. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co*., 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

### 1.  Defendant's Motion for Summary Judgment

Tilleman seeks summary judgment on all USI's claims that hinge on the enforceability of the restrictive covenants – specifically sections 8.5 and 8.6 – in Tilleman's employment agreement with USI.  Tilleman argues that these sections, which prohibit Tilleman from soliciting, servicing, or accepting business from former USI clients that he serviced for USI during his last two years of USI employment, are unenforceable; and therefore he is entitled to summary judgment.

### A.     *Idaho Law Governing Covenants Not to Compete*

Idaho law historically has disfavored covenants not to compete in the employment context: "Covenants not to compete in employment contracts are 'disfavored' and 'are to be strictly construed against the employer.'" *Intermountain Eye & Laser Centers, P.L.L.C. v. Miller*, 127 P.3d 121, 127 (Idaho 2005) (quoting

*Freiburger v. J–U–B Engineers, Inc.*, 111 P.3d 100, 106 (Idaho 2005)). Idaho courts find that a covenant not to compete is reasonable only if the covenant is: (1) not greater than is necessary to protect the employer in some legitimate business interest; (2) not unduly harsh and oppressive to the employee; and (3) not injurious to the public." *Id.*  The test of reasonableness focuses on "whether or not the clause [was] no more restrictive than necessary to protect the employer's legitimate business interests." *Freiburger*, 111 P.3d at 105.

In 2008, however, the Idaho legislature passed legislation allowing "key employees" and "key independent contractors" to enter into noncompete agreements protecting the employer's legitimate business interests. I.C. § 44-2701. The noncompete may prohibit the key employee or key independent contractor from engaging in employment or a line of business that is in direct competition with the employer's business. *Id.* But the agreement must be "reasonable as to its duration, geographical area, type of employment or line of business" and must "not impose a greater restraint than is reasonably necessary to protect the employer's legitimate business interests." *Id.*; *see also Herrick v. Potandon Produce, LLC,* No. 4:15-CV-00533-TS, 2016 WL 778355, at *2 (D. Idaho Feb. 26, 2016); *Blaskiewicz v. Spine Inst. of Idaho, P.A.*, ---P.3d----, 2022 WL 16548952, at *7 (Idaho Oct. 31, 2022). The statute directs Court to limit or modify unreasonable restrictive

covenants to reflect the intent of the parties and render the agreement reasonable. I.C. § 44–2703.

Key employees and key independent contractors are defined as those employees and independent contractors who "... have the ability to harm an employer's legitimate business interests." I.C. § 44-2702(1). "Legitimate business interests" are defined expansively to "include, but not be limited to, an employer's goodwill, technologies, intellectual property, business plans, business processes and methods of operation, customers, customer lists, customer contacts and referral sources, vendors and vendor contacts, financial and marketing information, and trade secrets[.]" I.C. § 44-2702(2).

The statute also creates several rebuttable presumptions relating to the reasonableness of a non-compete's restrictions. *Blaskiewicz*, 2022 WL 16548952, at *7. Specifically: (i) postemployment terms of eighteen months or less are presumed reasonable; (ii) geographical restrictions limited to those areas in which the key employee or key independent contractor provided services or had a significant presence or influence are presumed reasonable; and (iii) scope of activity restrictions limited to the type of employment or line of business conducted by the key employee or key independent contractor while employed by the employer are presumed reasonable. I.C. § 44-2704(2)-(4). The employee bears the burden of rebutting these presumptions. *Id.*

A careful review of the 2008 legislation reveals few, if any, substantive changes to the prior case law governing noncompete agreements in Idaho. This is borne out by the dearth of case law interpreting the statute since its enactment. It does, however, represent a significant change in the policy governing noncompetes. As noted, prior to the enactment of the 2008 statute, Idaho courts strongly disfavored noncompete agreements, limiting their enforceability and, despite authority to do so, often refused to modify overbroad noncompete agreements. *Freiburger*, 111 P.3d at 107-08; *Pinnacle Performance, Inc. v. Hessing*, 17 P.3d 308, 313-315 (2001).

Now, with the 2008 statute, the Idaho Legislature has altered Idaho policy regarding noncompete agreements by: (i) expressly providing for the creation and enforcement of noncompete agreements; (ii) providing rebuttable presumptions of reasonableness for durational, geographical, and scope of activity restrictions in noncompetes, which place the burden of proof on the employee and not the employer; and (iii) directing courts to limit or modify unreasonable noncompete agreements and specifically enforce the agreements as limited or modified. The cumulative effect of these changes is to create a broader policy favoring non-compete agreements.

## B.    Key Employee

Despite this fundamental shift in Idaho policy to favor non-compete agreements, Tilleman argues that Sections 8.5 and 8.6 are invalid as applied to him because he is not a "key employee" under Idaho Code section 44-2701.[2] The Court disagrees. A "key employee" includes those employees who "have the ability to harm or threaten an employer's legitimate business interests" by "reason of the employer's investment time, money, trust, exposure to the public, or *exposure to…. customers, vendors, or other businesses relationships during the course of employment.*" I.C. § 44-2702(1). Tilleman fits squarely within this definition.[3]

---

[2] No Idaho court has squarely answered this question. The Court must therefore predict how the Idaho Supreme Court would resolve the issue. *Air–Sea Forwarders, Inc. v. Air Asia Co.*, 880 F.2d 176, 186 (9th Cir.1989), *cert. denied*, 493 U.S. 1058, 110 S. Ct. 868, 107 L.Ed.2d 952 (1990).

[3] USI argues that the 2008 statute does not apply to the restrictive covenants at issue here because the statute only applies to "non-compete agreements," and not non-solicitation or anti-piracy provisions. The Court may have been persuaded by this argument if this case involved only a non-solicitation clause, but the restrictive covenants here are much broader than a standard non-solicitation clause in that they prohibit Tilleman from servicing former USI clients even if he did not solicit them. Idaho courts have treated such restrictive covenants as noncompete agreements. *See, e.g., Freiburger*, 111 P.3d at 105 (applying the same reasonableness test "regardless of whether the clause itself seeks to limit the employee's work in the field entirely or seeks only to limit the employee in approaching former clients); *see also Pinnacle Performance, Inc. v. Hessing*, 369, 17 P.3d at 313 (Ct. App. 2001) ("The covenant not to compete in the instant case unreasonably prevents Hessing from working in any capacity for all current and past clients of Pinnacle regardless of geographic location after the termination of his employment."). The Court further notes, in its reading of the 2008 statute, it actually benefits USI to have the statute apply given the statute shifts Idaho law to favoring noncompete agreements for "key employees."

During his many years of employment with CHS and then USI, Tilleman gained experience and expertise in the agricultural insurance business – using resources, trust, and customer access courtesy of CHS and USI. This experience and expertise allowed Tilleman to develop and nurture close relationships with clients, giving him substantial influence over client accounts. These close relationships with CHS and then USI's clients empowered Tilleman to harm or threaten USI's business. In fact, Tilleman acknowledged as much in his employment agreement:'

> by virtue of past employment with [CHS] . . . and future employment with [USI], [Tilleman] . . . has benefitted [and] will continue to benefit . . . from [USI's] investment of time, money and trust in [him] and will gain a high level of inside knowledge, influence, credibility, reputation or public persona as a representative or spokesperson of [USI], and, a***s a result, had, has, and will continue to have, the ability to harm or threaten [USI's] legitimate business interests***.

*Recitals*, Ex. A-1, Dkt. 2-2 at 14-15. (emphasis added). Tilleman further affirmed that he:

> had, has, and will have . . . significant responsibility for maintaining and enhancing the Goodwill of [USI] with respect to [USI's] Client Accounts and relationships with prospective clients and will have training and access to certain of [USI's] customers and suppliers and, as such, has developed, will continue to develop, or will develop close and direct relationships with such customers and suppliers.

*Id.* Tilleman has not and cannot meaningfully dispute his prior acknowledgements.

Instead, Tilleman argues he was not a "key employee" of USI because he "is informed and believes his compensation did not rank within the top 5% of USI," and because he was not involved in management and did not have the authority to hire, fire, or promote people, or make compensation decisions or other strategic or policy decisions. But the earnings argument only means that Tilleman is not *presumed* to be a "key employee" under the statute, *see* I.C. § 44-2704(5); it does not mean he does not fit within the broad statutory definition of key employee. And nothing in the statutory definition of "key employee" limits such employees to management or those who have authority to make strategic or policy decisions of the company. As Tilleman himself says, the agricultural insurance business is all about client relationships, and Tilleman's employment with CHS and USI exposed him to CHS and USI customers and allowed him to develop and nurture those relationships.

Even if Tilleman did not meet the definition of "key employee" under the statute, this would not make the restrictive covenants invalid per se as applied to him. As explained above, the 2008 legislation, if anything, expanded – not limited – the enforceability of restrictive covenants under Idaho law by, among other things, creating rebuttable presumptions of reasonableness and placing the burden of proof on the employee and not the employer to rebut those presumptions. If Tilleman did not fall within the definition of "key employee," it would only mean

that USI would not have the potential benefit of these presumptions, and the

common law, rather than the statutory framework, would apply. *See* § 15:40.

Restrictive covenants, 1 Termination of Employment § 15:40 ("The [2008]

legislation only applies to restrictive covenants signed by key employees…;

restrictive covenants or agreements with other employees…, who do not fall under

the definition of 'key employee'…are presumably covered by existing law and

precedent.").

### C.    *Reasonableness*

Tilleman next argues that Sections 8.5 and 8.6 are unenforceable to the

extent they go beyond protecting USI's "legitimate business interests." Under both

the common law and the statutory framework, restrictive covenants must "not

impose a greater restraint than is reasonably necessary to protect the employer's

legitimate business interests." I.C. § 44-2701; *Freiburger*, 111 P.3d at 105. "This

test can aptly be applied regardless of whether the clause itself seeks to limit the

employee's work in the field entirely or seeks only to limit the employee in

approaching former clients." *Freiburger*, 111 P.3d at 105.

The general rule is that an employer is not entitled to protection against

ordinary competition. *Pinnacle Performance*, 17 P.3d at 311. Employers, however,

are entitled to protection from the detrimental impact of competition by employees

who, but for their employment, would not have had the ability to gain special

influence over clients or customers. *Id.* "Thus, the employer has a protectable interest in the customer relationships its former employee established and/or nurtured while employed by the employer, and is entitled to protect itself from the risk that a former employee might appropriate customers by taking unfair advantage of the contacts developed while working for the employer." *Id.* (internal quotation marks and citation omitted).

Here, it cannot be disputed that USI has a protectable business interest in its customer relationships that Tilleman helped to develop and nurture while working for CHS and then USI. Again, this is true under both the case law and the statutory framework, which defines "legitimate business interests" to include the "employer's goodwill," as well as its "customers, customer lists, costumer contacts and referral sources." I.C. § 44-2702(2). USI is therefore entitled to protect itself from the risk that a former employee might appropriate customers by taking unfair advantage of the contacts developed while working for USI (or CHS). As noted, however, a restrictive covenant is only enforceable to the extent *it is necessary* to protect the employer's legitimate business interests. The covenant must be reasonable as to duration, geographical area, and scope of activity. *Pinnacle Performance*, 17 P.3d at 311; I.C. § 44-2701.

On its face, the restrictive covenants lack a geographical limitation but instead focus only on the "Client Accounts" and "Active Prospective Clients" with

whom Tilleman directly worked or about whom he obtained confidential
information during his last two years of employment at USI. Idaho courts have
consistently expressed a willingness to uphold these types of covenants if they are
narrowly tailored to include only those clients with whom the employee helped the
employer's goodwill effort toward that client: "We agree that an otherwise overly
broad geographical limitation may be considered reasonable if the class of persons
with whom contact is prohibited is sufficiently limited." *Pinnacle Performance*, 17
P.3d at 312; *c.f. Freiburger*, 111 P.3d at 107. In *Pinnacle*, the Idaho Court of
Appeals found the covenant not to compete in that case overly broad because the
scope of prohibited activity was not limited to the employer's clients with whom
the former employee had developed customer goodwill while working for his
former employer: "By failing to reasonably limit the scope of the prohibited
activity to those clients with whom Hessing had contact, the prohibitive impact of
the covenant not to compete was greater than necessary to protect Pinnacle's
legitimate business interest." *Pinnacle Performance*, 17 P.3d at 312; *see also
Freiburger*, 111 P.3d at 107.

By contrast, the covenants in this case specifically limit the scope of
prohibited activity to those clients or prospective clients with whom Tilleman had
contact during his last two years of employment with USI. As stated, USI has a
protectable business interest in the customer goodwill developed by Tilleman

while working for USI. "Such a business interest is reasonably protected by prohibiting [Tilleman] from providing services to those clients with whom [Tilleman] developed customer goodwill." *Pinnacle Performance*, 17 P.3d at 312. Likewise, under the statutory framework, such narrow covenants enjoy a rebuttable presumption of reasonableness in that they are, in effect, limited to the "geographic area" in which Tilleman "provided services or had a significant presence or influence." *See* I.C. § 44-2704(3) and (4). The Court therefore finds the restrictive covenants are reasonable as to the scope of prohibited activity and geographic area. *Id.*

The duration of the covenant is for two years following the termination of employment. Under section 44-2704(2), only covenants with a post-employment term of 18 months or less enjoy a presumption of reasonableness, *see* I.C. 44-2704(2), and the statute specifically prohibits a post-employment term exceeding 18 months "unless consideration, in addition to employment or continued employment, is given to a key employee…," *see* I.C. 44-2704. USI gave Tilleman consideration to extend the covenant to two years. Although the two-year term does not enjoy a presumption of reasonableness, Idaho courts have upheld two-year terms in non-compete agreements. *Bybee v. Isaac*, 178 P.3d 616, 622 (2008) (upholding five-year post-employment term; *Ins. Assocs. Corp. v. Hansen*, 723 P.2d 190, 194 (Ct. App. 1986) (upholding two-year post-employment term); *Now*

*Disc, Inc. v. Munn*, No. 4:10-CV-00403-EJL, 2010 WL 4853380, at *4 (D. Idaho Nov. 19, 2010) *In re King*, 403 B.R. 86, 90-92 (Bankr. D. Idaho 2009) (two-year "non-compete"; deeming two years "reasonable," saying "[t]he Idaho Supreme Court has upheld longer restrictions in non-compete agreements."). The Court similarly finds here that a two-year restriction is reasonable given that Tilleman received compensation to extend the post-employment term beyond 18 months.

Tilleman, however, urges the Court to find that Section 8.6 is unreasonable and overbroad to the extent it seeks to prohibit him from accepting business or servicing his former USI clients who left USI on their own initiative without any solicitation from Tilleman. Relying on a decision from the Superior Court of Massachusetts, *Getman v. USI Holdings Corp.*, No. 05-3286-BLS2, 2005 WL 2183159 (Mass. Super. Sept. 1, 2005), Tilleman argues that USI has no legitimate interest in business relationships with these clients because they have already decided to sever their ties with USI, and, in the insurance business, "most, although not all, of the good will belongs to the agent himself, because he is the person primarily responsible for selecting the best policy, working with the client to file claims, and following up with renewals." *Getman*, 2005 WL 2183159, at *3.

Tilleman's former colleague at USI who joined Alliant at the same time as Tilleman made a nearly identical argument under Oregon law in *Aitkin v. USI Ins. Servs., LLC*, --- F. Supp. 3d ---, 2022 WL 2158733, at *8 (D. Or. June 15, 2022).

The court in *Aitken* observed that the plaintiff's argument in that case that the non-accept and non-service provisions of the USI agreement were unreasonable "may hold merit" based solely on the reasoning in *Getman*. In *Getman*, the court determined that the non-solicitation agreement was enforceable, but "only to the extent that it strikes a fair balance between protecting USI's confidential information and the good will it has earned as a company vs. taking the good will earned by and belonging to [the employee] individually." *Id.* at *3. In striking that "fair balance," the court in *Getman* noted that the non-solicitation clause should not "bar [the employee] from accepting insurance business from his former [employer's] clients if, without his solicitation of their business, they wish him to continue ... to service their insurance needs." *Id.* But the court in *Aitken* found that Oregon law precluded a similar conclusion in that case, noting that the Oregon Supreme Court had previously held that an employer who pays their employees to develop goodwill with its clients, "is entitled to the good will which [the employees] so establish." *Id.*

Idaho law more closely aligns with Oregon law on this issue. Idaho courts have repeatedly held that an employer has a protectable business interest in the customer goodwill *developed by the employee while working for the employer*. *Pinnacle Performance*, 17 P.3d at 312; *Freiburger*, 111 P.3d at 105. In Idaho, as in Oregon, the goodwill developed by an employee on behalf of the employer belongs

to the employer, and the employer "is entitled to protect itself from the risk that a former employee might appropriate customers by taking unfair advantage of the contacts developed while working for the employer." *Freiburger*, 111 P.3d at 105. Idaho courts, unlike the court in *Getman*, have never found that the goodwill established by an employee belongs primarily to the employee and not the employer. Thus, under Idaho law, Tilleman's reliance on *Getman* is misplaced. All the provisions of the restrictive covenants protect legitimate business interests that both the Idaho courts and the Idaho legislature have found to be legally cognizable.

Accordingly, the restrictive covenants are enforceable in their entirety, including the provisions barring Tilleman from accepting his former clients who seek his services on their own initiative. The Court therefore denies Tilleman's motion for summary judgment based on his claims that the restrictive covenants are void and unenforceable.

## 2.  Plaintiff's Motion for Summary Judgment

### A.     *Breach of Contract*

USI argues that it is entitled to summary judgment on its claim for breach of the employment contract. To prevail on its breach of contract claim, USI must show: "(a) the existence of the contract, (b) the breach of the contract, (c) the breach caused damages, and (d) the amount of those damages." *Edged In Stone, Inc. v. Nw. Power Sys., LLC*, 321 P.3d 726, 730 (Idaho 2014) (citation omitted).

With respect to the first element, the parties do not dispute the existence of a contract and that Tilleman signed the employment agreement, and the Court has further held that the post-employment restrictive covenants are enforceable under Idaho law. Thus, the key question revolves around whether the undisputed facts establish as a matter of law that Tilleman breached his duty of loyalty under Section 2.4 of the Agreement, as well as the post-employment restrictive covenants found in Sections 8.5 and 8.6 of the Agreement.

### (1) Breach of the Duty of Loyalty

USI argues that Tilleman breached his contractual and common law duty of loyalty to USI by soliciting USI clients for Alliant while still employed at USI. In Section 2.4 of his employment agreement, Tilleman acknowledged "a duty of loyalty to [USI]" and agreed "to use… best efforts to faithfully, diligently, and completely perform all duties and responsibilities hereunder in furtherance of the business of [USI] and any other USI Company." *Agreement* § 2.4, Dkt. 2-2. In addition to this contractual duty of loyalty, Tilleman owed USI a common law fiduciary duty of loyalty, which includes the agent's "duty not to compete with the principal concerning the subject matter of his agency." *See R Homes Corp. v. Herr*, 123 P.3d 720, 723 (Idaho Ct. App. 2005) (quoting and deeming "instructive" Restatement (Second) of Agency § 393 (1957)). Hence, an agent is "not to solicit customers for a rival business before the end of the agent's employment . . .." *Id.* at

724; *Wesco Autobody Supply, Inc. v. Ernest*, 243 P.3d 1069, 1080-81 (Idaho 2010) (affirming denial of defendants' summary-judgment motion opposing claim that plaintiff's former employees breached fiduciary duty by "s[eeking] out customers or solicit[ing] customers before the termination of their employment").

In July 2020, prior to leaving USI in February 2021, Tilleman sent his friend and USI client, Chris Peha of Northwest Grain Growers, an email touting the benefits of Alliant over USI, including why he and another USI producer were choosing Alliant over USI and telling Peha that moving to Alliant would be "[c]ompletely seamless from your point of view," as the "only things that [would] change[] is the USI name will be replaced by Alliant on each policy." *Email from Tilleman to Peha*, Dates Decl., Ex. 78, Dkt. 65-80. Tilleman concluded the email by saying, "USI has taken away my ability to service my clients in the manner they deserve and require. I would greatly appreciate your support with this move." *Id.* Peha responded, "We are on board with the move." *Id.*

Peha moved his business to Alliant on February 5, 2021 – two days after Tilleman resigned from USI. *Broker Letter,* Dates Decl., Ex. 79, Dkt. 65-81. Peha and Tilleman had a telephone conversation and exchanged text messages on February 5, 2021. *Peha Dep.*, 52:22-Ex. 12-54:5, Dkt. 65-4.

Tilleman characterizes the July 2020 email as a discussion with a close friend seeking "moral support" for his potential move to Alliant and not as a

solicitation. In support of this characterization, Tilleman cites his own deposition testimony, as well as Peha's testimony that Tilleman did not encourage Northwest Grain Growers to follow him to Alliant. *Def's Resp. Br.*, p. 4, Dkt. 69 (citing *Peha Dep.* 56:10-13).  But Peha in his deposition specifically testified that he understood Tilleman's email as a request that Peha move Northwest Grain Growers to Alliant if Tilleman left:

> Q.·  ·And is it the purpose of -- is it your understanding that the purpose of Mr. Tilleman sending you this information about Alliant was that he was asking if Northwest Grain Growers would follow him to Alliant when he left USI?
>
> MR. STEPHENS: Object to the form.
>
> THE WITNESS: Yes.

*Peha Dep.* 38:4-10, Dates Decl., Ex. 1, Dkt. 65-4. Peha further testified that his reply to Tilleman, "We are on board with the move," meant that if Tilleman left USI and joined Alliant that Northwest Grain Growers would follow him to Alliant. *Id.* 38:25-39:10. Peha also testified that Tilleman's leaving USI to join Alliant was "the number one reason" that Northwest Grain Growers moved its business from USI to Alliant, *id.* 49:6-10, and that Tilleman remained Northwest Grain Growers "first point of contact for insurance services at Alliant," *id.* 30:10-15,

It is clear from the context of Tilleman's email to Peha, as illustrated by Peha's unequivocal testimony, that Tilleman's email constituted a request or solicitation that Northwest Grain Growers follow Tilleman to Alliant – and not a

request for mere "moral support" as Tilleman now contends. By sending an email to a USI client touting the benefits of a competitor of USI and asking the client if he would follow Tilleman to the competitor if he left, Tilleman was not using his best effort in furtherance the business of USI. Thus, Tilleman breached Section 2.4 of his employment agreement with USI, as well as his common law duty of loyalty owed to USI, which prohibited Tilleman from soliciting Northwest Grain Growers – a USI client – for Alliant – a rival business. *R Homes Corp. v. Herr*, 123 P.3d at 723.

The Court, however, finds issues of fact remain regarding whether Tilleman's conversations with Heath Barnes of Mercer Landmark, a former USI client, while Tilleman remained employed at USI constituted a violation of Tilleman's duty of loyalty to USI. Prior to leaving USI, Tilleman also spoke with Barnes, Tilleman's longtime friend, after Barnes complained about USI's poor service. Unlike Peha, however, Barnes unequivocally testified that Tilleman never solicited Mercer Landmark's business or asked Barnes to move Mercer's business to Alliant. *Barnes Dep.* 71:23-72-9, Dkt. 65-8. Barnes also testified that he left USI because of his dissatisfaction with its "incredibly piss-poor service" and not to follow Tilleman to Alliant. *Id.* 29:18-30:12. This testimony, at the very least, raises a question of fact about whether Tilleman solicited Mercer Landmark's business for Alliant while he remained employed at USI.

*(2) Breach of the Post-Employment Restrictive Covenants*

USI also alleges that Tilleman breached Sections 8.5 and 8.6 of the employment agreement, which only became effective after Tilleman left USI. Sections 8.5 and 8.6 provide, for a period of two years, Tilleman shall not, "directly or indirectly," on behalf of a competitor "in any capacity" (1) "solicit or attempt to solicit," (2) "divert or attempt to divert," or (3) "sell, provide, or accept any request to provide services in competition" with USI as to any of USI's active clients who Tilleman serviced or obtained confidential information about within two years of his resignation. Agreement §§ 8.5(a), 8.6(a). The Restrictive Covenants prohibit the same activity for period of six months as to any "Active Prospective Clients" that Tilleman solicited or obtained confidential information about in the six months prior to his resignation. Agreement §§ 8.5(b), 8.6(b). Additionally, Tilleman may not "induce the termination, cancellation or non-renewal" of USI's active clients. *Id.* § 8.5(a)(v).

USI does not appear to argue that Tilleman initiated contact with any client *after* he resigned from USI but instead argues that Tilleman breached Sections 8.5 and 8.6 in his employment agreement after joining Alliant by receiving calls from his former clients and referring them to his new colleagues at Alliant. USI also argues that accepted and serviced these clients by "field[ing] requests from his USI clients and mak[ing] sure those requests are taken care of, either by himself or one

of his Alliant colleagues," and by providing Alliant colleagues with information regarding those clients' insurance programs and service preferences. *Pls' Opening Br.*, p. 11-12, Dkt. 65-1.

The Court, however, cannot find as a matter of law that Tilleman's receiving phone calls from former USI clients, without Tilleman's initiating the contact, amounts to either direct or indirect solicitation in violation of the Tilleman's employment agreement. As other jurisdictions have indicated, "indirect solicitation requires affirmative action from an employee to persuade former clients to follow him to his new employer. *USI Ins. Servs. LLC v. Craig*, No. 18-CV-79-F, 2019 WL 5295533, at *4 (D. Wyo. Apr. 9, 2019) (citing *Lifebrite Labs., LLC v. Cooksey*, 2016 WL 7840217, at *7, 2016 U.S. Dist. LEXIS 181823, at *21 (N.D. Ga. Dec. 9, 2016) (holding that an employee did not directly or indirectly solicit former clients when she informed them she was no longer working for her former employer) and *Akron Pest Control v. Radar Exterminating Co.*, 216 Ga.App. 495, 455 S.E.2d 601, 603 (holding that the mere acceptance of business from former clients did not constitute indirect solicitation) (Ga. Ct. App. 1995); *see also Aitkin*, --- F. Supp. 3d ---, 2022 WL 2158733, at *10. "[M]erely informing customers of a change in employment does not constitute solicitation. Likewise, a willingness to discuss business upon invitation of another party does not constitute solicitation." *Aitkin,*

*Aitkin*, --- F. Supp. 3d ---, 2022 WL 2158733, at *10 (quoting *Craig*, 2019 WL 5295533 at *4) (internal quotation marks omitted).

Here, USI presents evidence that Tilleman referred clients who called him to his new Alliant colleagues and provided their contact information. But there is no evidence that Tilleman said anything during the calls with his former clients *after he left USI* that could constitute attempts to solicit, divert, or accept business from them. Instead, USI asks the Court to make inferences in its favor as to its circumstantial evidence. The Court, however, must draw inferences from the facts in the light most favorable to Tilleman as the non-moving party. Unresolved questions of material fact exist as to whether Tilleman's affirmative acts amounted to direct or indirect solicitation of his former clients' business or indirect diversion of services as to those clients away from USI in violation of Section 8.5. Similarly, no undisputed facts definitively show as a matter of law that Tilleman accepted requests to provide services to his former clients in violation of Section 8.6.

Whether Tilleman telling his former clients to call his new colleagues or answering client questions periodically constitutes a breach of his employment agreement with USI will be for a jury to decide. The Court recognizes it is a closer question whether Tilleman's contacts with Peha of Northwest Grain Growers constituted a breach of the post-employment covenants. The July 2020 email Tilleman sent to Peha before he left USI, coupled with evidence that Tilleman

exchanged telephone calls and text messages with Peha on February 5, 2021, two days after Tilleman resigned, and the very day Northwest Grain Growers switched from USI to Alliant, along with Peha's testimony that Tilleman's moving to Alliant was the number one reason Northwest Grain Growers made the switch, is strong proof of a violation of post-employment covenants. But Tilleman's direct solicitation of Northwest Grain Growers occurred while he remained employed at USI, which would not be a breach of post-employment covenants. And the Court cannot say as a matter of law that Tilleman's contacts with Peha after Tilleman resigned from USI constituted a breach of Sections 8.5 and 8.6. This too will be for the jury to decide. Making inferences in the light most favorable to Tilleman, the Court denies summary judgment for USI on its claim for breach of the post-employment restrictive covenants.

### B.   *Tortious Interference with Contract and Prospective Economic Advantage.*

USI also asserts a claim against Alliant in its Amended Complaint for tortious interference with contract. Four elements must be proven to establish a prima facie case of tortious interference with contract. The plaintiff must show that 1) there was a contract in existence; 2) the defendant knew of the contract; 3) the defendant intentionally interfered with the contract, causing a breach; and 4) injury

to the plaintiff resulted from the breach. *Magic Valley Truck Brokers, Inc. v. Meyer*, 133 Idaho 110, 982 P.2d 945, 950 (Idaho Ct.App.1999).

In this case, USI asserts that Alliant tortiously interfered with the Tillman's employment agreement. To prevail on this claim, USI must prove that Alliant, with knowledge of the agreements, engaged Tillman to perform work that violated his employment agreement. *Magic Valley Truck Brokers v. Meyer*, 982 P.2d 945, 951 (Idaho Ct. App. 1999). Disputed issues of fact exist on this question as well. For example, Alliant and Tilleman have provided evidence that Alliant had Tilleman execute "Alliant's Prospective Departure Protocols," in which Alliant instructed Tilleman not to breach the restrictive covenants; Alliant instructed Tilleman not to solicit or service USI clients; Alliant testified that it did not hire Tilleman (or anyone else) to harm USI. Drawing all inferences in Alliant's favor, as the Court must, this is enough to create an issue of fact on USI's tortious interference with contract claim.

## ORDER

**IT IS ORDERED:**

1.    Defendant Lee Tilleman's Motion for Partial Summary Judgment (Dkt. 64) is DENIED.

2.    Plaintiff's Motion for Partial Summary Judgment (Dkt. 65) is GRANTED in part and DENIED in part as explained in this decision.

DATED: December 2, 2022

B. Lynn Winmill
U.S. District Court Judge